IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

|  |  |
|---|---|
| MARK VOELKER,<br><br>                    Plaintiff,<br><br>     vs.<br><br>BNSF RAILWAY COMPANY, a<br>Delaware corporation,<br><br>                    Defendant. | CV 18–172–M–DLC<br><br><br>ORDER |

Before the Court are several pending discovery motions filed by both Plaintiff Mark Voelker and Defendant BNSF Railway Company.  These include: (1) Mr. Voelker's Second Motion to Compel (Doc. 58); (2) BNSF's Motion for Protective Order Regarding Plaintiff's Fourth and Fifth Discovery Requests (Doc. 81); (3) BNSF's Motion for Protective Order Quashing Depositions of Ahern, Wunker & Hegi (Doc. 83); (4) BNSF's Motion for Protective Order Quashing Depositions of Lawler, Ramos, Harvey & Wilson (Doc. 85); (5) Mr. Voelker's Third Motion to Compel (Doc. 87); and (6) BNSF's Motion for a Protective Order Regarding Interrogatories Contained in Plaintiff's Fourth and Fifth Set of Discovery Requests (Doc. 102.)  The Court finds oral argument on these motions unnecessary and adjudicates each one in turn below.

1

## BACKGROUND

"Modern instruments of discovery serve a useful purpose . . . [they] make a trial less a game of blind man's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958).  Such instruments exist "to take the sporting element out of litigation, partly by affording each party full access to evidence in the control of his opponent." *Martin v. Reynolds Metals Corp.*, 297 F.2d 49, 56 (9th Cir. 1961).  But, "[e]xcessive discovery and evasion or resistance to reasonable discovery requests pose significant problems . . . [and] the spirit of the rules is violated when advocates attempt to use discovery tools as tactical weapons rather than to expose the facts and illuminate the issues." *Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Court for Dist. of Mont.*, 408 F.3d 1142, 1148–49 (9th Cir. 2005).  Given the frequency and extent of discovery squabbles in this case, the parties and their counsel would be wise remember the foregoing principles.

Indeed, seeking judicial resolution of discovery disputes should be an option of last resort.  In litigation of this type, however, which has become familiar in this District, counsel appears to treat discovery motions as common practice.  *See, e.g., Jones v. BNSF Ry. Co.*, 2019 WL 6728429 (D. Mont. 2019) (CV 18–146–M–DLC); *Brewer v. BNSF Ry. Co.*, 2016 WL 11695454 (D. Mont. 2016) (CV 14–65–

GF–BMM–JTJ).  In this case alone, the parties have requested that this Court

intervene in the discovery process at least seven times.  As the Court previously

advised the parties and their counsel during the October 14, 2020 status

conference, they should be mindful of the frequency with which such intervention

is sought.

STANDARD

This Court has previously articulated the standard it applies in resolving

discovery disputes and finds no need to restate it in full here.  (Doc. 92 at 2–5.)  In

short, this Court takes a broad view regarding the proper scope of discovery.  (*Id.*)

DISCUSSION

The Court resolves each of the six pending discovery motions in turn.

**I.     Mr. Voelker's Second Motion to Compel (Doc. 58).**

As previously noted, Mr. Voelker's Second Motion to Compel (Doc. 58)

seeks the production of various emails produced by BNSF in redacted form.  (Doc.

92 at 34.)  BNSF maintains these emails are protected from unredacted disclosure

because of attorney client privilege and/or the work-product doctrine.  (Doc. 63 at

4–11.)  In order to properly adjudicate this motion, this Court ordered BNSF to

produce unredacted copies of the emails at issue for *in camera* review.  (Doc. 92 at

34–35.)  Such emails were filed by BNSF under seal on October 30, 2020.  (Doc.

100).  Having reviewed such emails, the Court reaches the following conclusions.

3

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 387, 389 (1981).   It is well established that this privilege applies with equal force when the client is a corporation as opposed to a natural person. *Id.* at 389–90.  At its core, the attorney-client privilege forbids disclosure of "confidential disclosures made by a client to an attorney in order to obtain legal advice, as well as an attorney's advice in response to such disclosures." *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) (alterations omitted). This includes, "communications between lawyers and their clients when the lawyers act in a counseling and planning role, as well as when lawyers represent their clients in litigation." *United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996).

But just because a person is a licensed attorney does not pull any conversation with them within the cloak of attorney-client privilege. *Id.*  Indeed, the attorney-client privilege is strictly construed because it impedes the pre-eminent consideration in any legal matter, "full and free discovery of the truth." *Id.* (adding the attorney-client privilege "ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle") (internal citations omitted).

Eight essential elements govern application of the attorney-client privilege, which are enumerated by the Ninth Circuit as follows:

> (1) Where legal advice of any kind is sought (2) from a professional
> legal adviser in his capacity as such, (3) the communications relating
> to that purpose, (4) made in confidence (5) by the client, (6) are at his
> instance permanently protected (7) from disclosure by himself or by
> the legal adviser, (8) unless the protection be waived.

*In re Grand Jury Investigation*, 974 F.2d 1068, 1071 n.2 (9th Cir. 1992).  "As with

all evidentiary privileges, the burden of proving that the attorney-client privilege

applies rests not with the party contesting the privilege, but with the party asserting

it."  *Weil v. Investment/Indicators, Res. and Mgmt., Inc.*, 647 F.2d 18, 25 (9th Cir.

1981).

Alternatively, BNSF invokes the work product doctrine to shield

dissemination of the emails at issue.  The work product doctrine is codified in the

Federal Rules of Civil Procedure and protects discovery of "documents and

tangible things that are prepared in anticipation of litigation or for trial or for

another party or its representative."  Fed. R. Civ. P. 26(b)(3).  In order to qualify

for work product protection, "documents must have two characteristics: (1) they

must be prepared in anticipation of litigation or for trial, and (2) they must be

prepared by or for another party or by or for that other party's representative."  *In

re Grand Jury Subpoena*, 357 F.3d 900, 907 (9th Cir. 2004).  Critically, the "work

product doctrine does not apply to information collected or communications made

in the normal course of business," and instead applies "only to material generated

primarily for use in litigation, material that would not have been generated but for

the pendency or imminence of litigation." *Kelly v. City of San Jose*, 114 F.R.D. 653, 659 (N.D. Cal. 1987) (citing *Hickman v. Taylor*, 329 U.S. 495 (1947)).

Even if protected by the work product doctrine, dissemination is nonetheless proper if the documents "are otherwise discoverable under Rule 26(b)(1)" and "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A). As such, the "principal difference between the attorney-client privilege and the work product doctrine . . . is that the privilege cannot be overcome by a showing of need, whereas a showing of need may justify discovery of an attorney's work product." *Admiral Ins. Co. v. U.S. Dist. Court for Dist. of Ariz.*, 881 F.2d 1486, 1494 (9th Cir. 1989).

As a threshold matter, BNSF has already produced several of the emails at issue in unredacted form, without contending they enjoy protection under the attorney-client privilege or work-product doctrine. As such, the Court finds it necessary to excise them from its analysis at the outset. These emails include:

(1)     December 15, 2016, 7:27 A.M. email from Cargill to Stauffer (Doc. 59-4 at 3);

(2)     March 8, 2017, 12:52 P.M. email from Cargill to Marx (*Id.* at 33);

(3)     March 31, 2017, 3:31 P.M. email from Marx to Pino, et al. (*Id.* at 38–40, 43, 46, 50, 52–54, 58, 60–62, 65, 69);

(4)     March 31, 2017, 7:53 A.M. email from Detlefson to Marx (*Id.* at 38–40, 43–44, 46–47, 49–51, 53, 55, 58, 60, 62, 65–66, 70);

(5)     April 2, 2017, 4:43 P.M. email from Pino to Stauffer (*Id.* at 39);

(6)     April 3, 2017, 6:08 A.M. email from Gabriel to Marx (*Id.* at 40, 54);

(7)     April 4, 2017, 2:14 P.M. email from Gabriel to Stauffer (*Id.* at 41, 63, 67);

(8)     April 4, 2017, 1:09 P.M. email from Stauffer to Gabriel (*Id.* at 41, 56, 63–64, 67–68);

(9)     April 4, 2017, 11:50 A.M. email from Gabriel to Stauffer (*Id.* at 42, 57, 59, 64, 68);

(10)    April 4, 2017, 6:40 P.M. email from Gabriel to Randle (*Id.* at 45);

(11)    April 4, 2017, 11:34 A.M. email from Gabriel to Marx (*Id.* at 54);

(12)    April 4, 2017, 10:36 A.M. email from Marx to Gabriel (*Id.*);

(13)    April 4, 2017, 1:36 P.M. email from Gabriel to Stauffer (*Id.* at 56);

(14)    April 5, 2017, 3:10 P.M. email from Gabriel to Stauffer (*Id.* at 63);

(15)    April 5, 2017, 2:53 P.M. email from Stauffer to Gabriel (*Id.*);

(16)    April 5, 2017, 5:58 A.M. email from Stauffer to Gabriel (*Id.*);

(17)    April 4, 2017, 6:53 P.M. email from Gabriel to Stauffer (*Id.*); and

(18)    April 5, 2017, 6:06 A.M. email from Gabriel to Stauffer (*Id.* at 67.)

Having removed the foregoing emails form its inquiry, the Court turns first to BNSF's claim of attorney-client privilege as to the remaining emails. The Court finds that some, but far from all, of the remaining emails are protected from dissemination.[1]

Specifically, the following emails are protected by the attorney-client privilege on the basis that they satisfy the eight-part test outlined above:

(1)   December 15, 2016, 2:40 P.M. email from Hyatt to Cargill (Doc. 100. at 4);

(2)   December 15, 2016, 1:21 P.M. email from Cargill to Hyatt, et al. (*Id.* at 4–5);

(3)   December 15, 2016, 10:41 A.M. email from Hyatt to Cargill, et al. (*Id.* at 5–6);

(4)   December 19, 2016, 2:27 P.M. email from Hyatt to Stauffer (*Id.* at 8);

(5)   December 19, 2016, 2:50 P.M. email from Hyatt to Wunker, et al. (*Id.* at 10, 14–16);

(6)   December 13, 2016, 1:45 P.M. email from Wunker to Jayne (*Id.* at 11, 16–17);

---

[1] To ensure protection of privileged material, the Court refers to specific emails by their sent date and the pages on which it exists in the unredacted emails filed under seal. *See* Doc. 100.

(7)      December 13, 2016, 12:25 P.M. email from Jayne to Wunker (*Id.* at 11, 17);

(8)      December 22, 2016, 9:26 A.M. email from Hyatt to Wunker, et al. (*Id.* at 12);

(9)     January 3, 2017, 2:58 P.M. email from Kirschinger to Hyatt, et al. (*Id.* at 19, 25);

(10)    January 3, 2017, 1:53 P.M. email from Hyatt to Meenan, et al. (*Id.* at 19, 25–26);

(11)    December 22, 2016, 11:20 A.M. email from Hyatt to Meenan (*Id.* at 20–21, 27–28);

(12)    All emails contained on pages 30–37 (*Id.* at 30–37), with the exception of any emails previously excised; and

(13)    March 31, 2017 email from Hyatt to Marx (*Id.* at 48.)

The foregoing emails constitute confidential communications between client and counsel for the purposes of obtaining or rendering legal advice.  Because these emails are protected by the attorney-client privilege, the Court finds it immaterial whether these emails are also afforded protection under the work-product doctrine. This holding excludes, however, the:

(1)      December 14, 2016, 5:02 P.M. email from Hyatt to Stauffer (*Id.* at 100 at 1);[2]

(2)      Meeting Notification sent by Wunker (*Id.* at 2);

(3)      December 14, 2016, 6:02 P.M. email from Stauffer to Hyatt and Cargill (Doc. 100 at 3, 6, 7, 9)

(4)      December 15, 2016, 1:50 P.M. email from Cargill to LaCounte, et al. (*Id.* at 4);

(5)      December 15, 2016, 9:46 A.M. email from Hyatt to Stauffer (*Id.* at 7–9);

(6)      December 15, 2016, 11:05 A.M. email from Stauffer to Hyatt (*Id.* at 8);

(7)      December 13, 2016, 2:25 P.M. email from Jayne to Pryor, et al. (*Id.* at 10, 16);

(8)      December 20, 2016, 9:57 A.M. email from Wunker to Hills (*Id.* at 12);

(9)      December 20, 2016, 7:15 A.M. email authored by Hills (*Id.* at 12–13);

(10)     December 20, 2016, 7:43 A.M. email from Wilson to Jayne (*Id.* at 13);

---

[2] The Court takes this opportunity to express its frustration that BNSF would represent to this Court and opposing counsel that an automatic out of office email from an attorney is protected by the attorney-client privilege.

(11)    December 20, 2016, 7:38 A.M. email authored by Jayne (*Id.*);

(12)    December 19, 2016, 9:05 P.M. email from Hills to Wilson (*Id.*);

(13)    December 19, 2016, 8:59 P.M. email authored by Wilson (*Id.* 13–14);

(14)    December 19, 2016, 8:46 P.M. email authored by Jayne (*Id.* at 14);

(15)    December 19, 2016, 5:33 P.M. email authored by Wunker (*Id.*);

(16)    January 9, 2017, 1:12 P.M. email from Pino to Hyatt (*Id.* at 18, 24);

(17)    January 9, 2017, 1:03 P.M. email from Hyatt to Pino (*Id.* at 18, 24–25);

(18)    December 28, 2016, 10:05 P.M. email from Meenan to Kirschinger, et al. (*Id.* at 19, 26);

(19)    December 28, 2016, 2:11 P.M. email from Hyatt to Meenan (*Id.* at 20, 26–27);

(20)    December 28, 2016, 12:43 P.M. email from Meenan to Hyatt (*Id.* at 20, 27);

(21)    December 19, 2016, 5:15 P.M. email from Harvey to Meenan (*Id.* at 21–22, 28);

(22)    December 19, 2016, 5:14 P.M. email Meenan to Harvey (*Id.* at 22, 28–29);

(23)    December 19, 2016, 4:18 P.M. email from Harvey to Meenan (*Id.* at 22–23, 29);

(24)   January 9, 2017, 1:37 P.M. email from Pino to Hyatt (*Id.* at 24);

(25)   January 9, 2017, 1:21 P.M. email from Hyatt to Pino (*Id.*); and

(26)   Emails contained on pages 39–40, 42–43, 45–46, 48-70, not previously excised or found to be protected by the attorney-client privilege.

These emails lack attorney-client privilege protection because they do not contain confidential communications, are not made between client and counsel, merely establish the fact that a communication occurred, or amount to nothing more than internal dialogue between BNSF officials regarding Mr. Voelker's investigation and termination.  In short, none of these communications encapsulate confidential communications between counsel and client for the purposes of securing or rendering legal advice.

The Court thus examines whether these emails are nonetheless afforded work-product protection.  Having examined the emails the Court can readily conclude that none of the emails contained in the above-enumerated list were made in anticipation of litigation.  Instead, these emails constitute discussions between BNSF employees both before and after Mr. Voelker was terminated without indication that such communications would not have occurred "but for the pendency or imminence of litigation." *See, e.g., E.E.O.C. v. Safeway Store, Inc.*, 2002 WL 31947153, *5 (N.D. Cal. 2002).

12

BNSF appears to assert that any document or communication generated pursuant to the investigation or termination of an employee is protected by the work-product doctrine.  But this approach would distort the qualified work-product privilege beyond meaning and unduly restrict the fact-finding process in litigation of this sort.  Additionally, as noted above, the work-product doctrine does not extend to documents produced in the ordinary course of business.  In short, the emails enumerated above in items 1 through 26 do not fall within the scope of the work product doctrine or the attorney-client privilege.

**Accordingly, the Court will grant Mr. Voelker's second motion to compel (Doc. 58) as to the emails specifically identified above as protected by neither the attorney-client privilege nor the work-product doctrine, and BNSF is ordered to produce them in unredacted form within seven days of this Order.**

## II.    BNSF's Motion for Protective Order Regarding Plaintiff's Fourth and Fifth Discovery Requests (Doc. 81).

BNSF has moved for a protective order with respect to 108 requests for production sent by Mr. Voelker in his fourth and fifth sets of discovery requests. (Doc. 82 at 2.)  BNSF argues that these requests are irrelevant, overly broad, unduly burdensome, disproportionate to the needs of the case, and seek non-discoverable information.  (*Id.* at 3–11.)  Mr. Voelker responds by arguing that BNSF has failed to: (1) respond to the requests within 30 days, thus waiving any

and all objections; (2) fulfill its meet and confer obligations prior to moving for a protective order; and (3) establish good cause justifying the issuance of a protective order.  (Doc. 93 at 5.)

The Federal Rules of Civil Procedure authorize this Court to issue a protective order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" only if it is supported by good cause. Fed. R. Civ. P. 26(c)(1).  Indeed, a finding of good cause is essential, and this Court must "identify and discuss the factors it considered in its 'good cause' examination to allow appellate review of the exercise of its discretion."  *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003) (internal citations omitted).

Importantly, BNSF, as the party seeking a protective order "bears the burden" of establishing that for each request at issue, the failure to issue a protective order will result in "specific prejudice or harm."  *Id.*  "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning" are insufficient to warrant the issuance of a protective order.  *Beckman Indus., Inc. v. International Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992).

Additionally, objections to requests for production or interrogatories must generally be leveled within 30 days after service of such discovery is made.  Fed. R. Civ. P. 33(b)(2), 34(b)(2)(A).  Indeed, prior Ninth Circuit cases state "[i]t is

14

well established that a failure to object to discovery requests within the time"
required by the Federal Rules of Civil Procedure "constitutes a waiver of any
objection." *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473
(9th Cir. 1992). This harsh result is likewise supported by the District's Local
Rules, which carry the force of law. L.R. 26.3(a)(4); *see also Richmark*, 959 F.2d
at 1476, n.5 (noting "valid local rules have the force of law").

This is not the only Ninth Circuit law on the issue, however, and the Court
pays particular attention to a 2005 case involving BNSF. There, the Ninth Circuit
rejected the principle that the failure to properly assert a privilege objection to a
Rule 34 request within 30 days constituted a "*per se* waiver." *Burlington
Northern*, 408 F.3d at 1149. Instead, the Ninth Circuit instructed district courts to
use "the 30–day period as a default guideline" only conclusively finding a waiver
of objections after making "a case-by-case determination" and considering a
number of factors. *Id.*

Rule 26 also imposes strict meet and confer efforts on the moving party
before a protective order can be successfully sought. *Id.* 26(c)(1) (stating "[t]he
motion must include a certification that the movant has in good faith conferred or
attempted to confer with other affected parties in an effort to resolve the dispute
without court action"). Additionally, per the Local Rules, all discovery motions

will be denied unless the parties have satisfactorily performed their meet and confer obligations.  L.R. 26.3(c)(1).

The Court finds it prudent to first address the issue of waiver.  The record indicates that BNSF was served with Mr. Voelker's fourth set of discovery requests on September 11, 2020 and his fifth set of discovery requests on September 28, 2020.  (Docs. 82-1; 82-2.; 94)  Both the fourth and fifth sets of discovery requests contain interrogatories and requests for production.[3]  As such, under Rules 6, 33 and 34, BNSF's responses, including any objections, were due by October 14, 2020 for the fourth set of requests and November 2, 2020 for the fifth set of requests.[4]

Mr. Voelker contends that BNSF's failure to file and serve responses to his fourth set of discovery requests by October 14, 2020 constitutes a waiver of any objections.  (Doc. 93 at 8–9.)  The Court disagrees.  (Doc. 81.)  As noted above, despite Ninth Circuit authority harshly concluding the failure to level objections within 30 days amounts to an automatic wavier, there is also authority that this Court is not to mechanistically apply the 30-day deadline, and instead, engage in a context-specific analysis.  *Burlington Northern*, 408 F.3d at 1149.

---

[3] Of note, BNSF's motion (Doc. 81) only seeks a protective order as to the requests for production contained in Mr. Voelker's fourth and fifth set of discovery requests.  (Doc. 82 at 2.) BNSF did not move for a protective order as to the interrogatories propounded in these requests until November 6, 2020.  (Doc. 102.)

[4] Because service was accomplished, in part, by mail, the Court adds three days pursuant to Rule 6(d), for a total response window of 33 days. (Docs. 81-1; 81-2.)

Critical here, prior to the expiration of the deadline to respond to either Mr. Voelker's fourth or fifth set of discovery requests, BNSF filed its motion for a protective order with the Court raising several objections to the requests for production contained therein.  (Doc. 81.)  The Court finds that not only does this arguably constitute the timely leveling of objections to those requests by BNSF, but even if it did not, BNSF's motion for a protective order prior to the response deadline sufficiently preserved its objections to those requests.  As such, no waiver has occurred.

The Court next turns to the issue of BNSF's alleged non-compliance with the requisite meet and confer obligation.  Mr. Voelker represents that in response to his service of the 108 requests for production, BNSF notified his counsel that "they were objecting to [his] discovery and would be filing a motion for a protective order" and "did not attempt to discuss, work out, or resolve any specific objections to discovery." (Doc. 93 at 7–8.)  BNSF responds by maintaining it conducted a telephone conversation with Mr. Voelker's counsel in which its objections to the discovery requests were discussed.  (Doc. 101 at 2.)  Taking BNSF at its word, the Court finds no basis upon which to deny BNSF's motion

(Doc. 81) for a failure to meet and confer.[5]  As such, the Court will proceed to adjudicate this motion on the merits.

In resolving the motion (Doc. 81) on the merits, the Court has carefully examined each of the 108 requests for production contained within Mr. Voelker's fourth and fifth sets of discovery requests.  (Docs. 82-1; 82-2.)  Having reviewed such requests and the arguments advanced by the parties, the Court reaches the following conclusions.  BNSF's objections to Requests for Production Nos. 72–74, 80, 88–90, 92–95, 99, 104–107, 110–113, 116, 119–122[6], 126–129, 133–136, 142–143, 145–147, 152–153, 155, 157–159, 161–166,[7] 168, 170–171, 175–180 are overruled and it is ordered to produce any responsive documents in its possession within seven days of this Order.  These requests fall within the permissible bounds of discovery and seek information that is relevant to this dispute.  BNSF's broad

---

[5] The Court does note, however, that BNSF's blanket refusal to respond to 106 requests for production is troubling and the Court is skeptical that a genuinely productive meet and confer session as to that many requests could be accomplished with a single phone call.  The Court warns BNSF not to dispose of its discovery obligations with such haste in the future.

[6] With respect to Requests for Production Nos. 120–122, 142, 155 BNSF shall produce any responsive documents to the extent they are not protected by the attorney-client privilege.  The Court warns BNSF to carefully examine such communications before claiming such privilege because, as illustrated above, many claims of privilege as to the emails contained in Doc. 100 were without merit.

[7] The Court notes that the documents sought in Mr. Voelker's Request for Production No. 162 is very similar to the information he moves this Court to compel production of in his Third Motion to Compel Discovery (Doc. 87.)  (*See* Doc. 82-1 at 24 (stating "[p]roduce a copy of the outline that Ben Mark drafted and/or created regarding the BNSF disciplinary investigation of Voelker").)  Because the information sought in Mr. Voelker's motion (Doc. 87) consists of outlines *provided to* (rather than generated by) Mr. Marx, the Court finds separate analysis necessary.  (Doc. 88 at 3.)

sweeping claims of harm are insufficient to establish the good cause necessary to issue a protective order.

The Court will modify Requests for Production Nos. 77–79, 81–85, 100–103, 108–109, 114, 123–125, 148–151, 154 to extend only from 2014 to the present, as is consistent with its prior Order.  (Doc. 92.)  The Court also modifies Request for Production No. 115 to exclude 45 U.S.C. § 55 and 49 U.S.C. § 20109 from its scope on the basis that discovery into information related to such provisions falls outside the broad scope of relevancy applied by this Court.  BNSF shall produce any responsive documents in its possession to these requests, as modified, within seven days of this Order.  The Court denies BNSF's motion (Doc. 81) as to Requests for Production Nos. 130–132, only to the extent such individuals were involved in the "investigation and/or termination of Plaintiff" as is consistent with this Court's prior Order.  (Doc. 92 at 21–22.)  BNSF shall produce any responsive documents as to these requests within seven days of this Order.

BNSF's objections to Requests for Production Nos. 75–76, 91, 96–98, 115, 117–118, 137–141, 144, 148, 156, 160, 167, 169, 172–174 are sustained, and the Court finds good cause to issue a protective order as to those requests. Specifically, the Court finds that these requests seek irrelevant information, are unduly burdensome, and are duplicative of requests already propounded in this

litigation.  For example, Request for Production No. 98 seeks the calendars of all persons present at Mr. Voelker's PEPA Board meeting.  (Doc. 82-1 at 16.) Request for Production No. 139 seeks the production of, for inspection and copying, numerous electronic devices for various BNSF employees.  These requests are unduly burdensome, overbroad, and borderline harassing.  Good cause warrants the issuance of a protective order as to these requests.

**Accordingly, the Court will deny BNSF's motion (Doc. 81) as to Requests for Production Nos. 72–74, 80, 88–90, 92–95, 99, 104–107, 110–113, 116, 119–122 , 126–129, 133–136, 142–143, 145–147, 152–153, 155, 157–159, 161–166, 168, 170–171, 175–180, and Requests for Production Nos. 75–76, 91, 96–98, 115, 117–118, 130–32, 137–141, 144, 148, 156, 160, 167, 169, 172–174, as modified.  The Court grants BNSF's motion (Doc. 81) as to Requests for Production Nos. 75–76, 91, 96–98, 115, 117–118, 137–141, 144, 148, 156, 160, 167, 169, 172–174.  It is further ordered that BNSF shall produce any responsive documents within seven days of this Order.**

### III.   BNSF's Motion for Protective Order Quashing Depositions of Ahern, Wunker & Hegi (Doc. 83).

BNSF has moved for a protective order prohibiting Mr. Voelker from deposing Nancy Ahern, Barry Wunker, and Eric Hegi.  (*See generally* Doc. 83.)  In support of this request, BNSF argues that depositions of Ms. Ahern and Mr. Wunker would constitute duplicative discovery because they were already deposed

in the *Wooten* litigation, that Ms. Ahern, Mr. Wunker, and Mr. Hegi do not possess any relevant information, and that a deposition of Mr. Hegi is barred by a protective order previously issued by this Court.  (Doc. 84 at 3–7.)

The Court first addresses the contention that depositions of Ms. Ahern and Mr. Wunker would be duplicative because they were previously deposed in different litigation.  (*Id.* at 3–4.)  Mr. Voelker argues that no substantive inquiry into the claims he asserts in the instant litigation were undertaken during those depositions.  (Doc. 97 at 8–10.)  Mr. Voelker also argues that the cases relied on by BNSF for the proposition that duplicative depositions are disfavored only apply to situations in which multiple depositions were sought in the same litigation.  The Court agrees.

Notably, BNSF has not provided the Court with any authority for the proposition that when a plaintiff conducts a deposition in one case, a completely different plaintiff is prohibited from subsequently deposing that individual in a different case.  This is unsurprising, because it would defy reason to conclude that when Ms. Ahern and Mr. Wunker were deposed in the *Wooten* litigation, Mr. Voelker, who was not even a party to that lawsuit, was afforded adequate opportunity to discover evidence regarding his own termination.  In short, BNSF's argument that depositions of Ms. Ahern and Mr. Wunker would be duplicative because they were deposed in the *Wooten* litigation is without merit.

21

BNSF's contention that Ms. Ahern and Mr. Wunker do not possess discoverable information is similarly unavailing.  Specifically, BNSF represents that Ms. Ahern and Mr. Wunker only possess information regarding the *Wooten* matter and played no role in the determination to terminate Mr. Voelker.  But this argument ignores what is relevant in the discovery context.  BNSF employees who decided to terminate Mr. Voelker are not the only persons who possess relevant information for discovery purposes.  On the contrary, BNSF employees who furnished information to the officials involved in the decision to terminate Mr. Voelker likely possess critical information, including precisely what information was provided and when such information was transmitted.

Indeed, BNSF admits that information which formed the basis of its decision to terminate Mr. Voelker came from Mr. Wunker.  (Doc. 107 at 3.)  Additionally, documents filed with the Court, which pursuant to this Order must be produced in unredacted form, demonstrate that Ms. Ahern was at least invited to a meeting regarding "potential discipline for improper dissemination of BNSF computer information" by Mr. Voelker.  (Doc. 100 at 2.)  In short, the Court finds no reason to conclude that the depositions of Ms. Ahern and Mr. Wunker fall outside of the broad view of discovery this Court applies to discovery disputes.

The Court is not persuaded, however, that alteration of its prior ruling prohibiting the deposition of Mr. Hegi is warranted.  This Court has previously

22

held that Mr. Voelker is not entitled to depose Mr. Hegi unless BNSF stipulates to such a deposition or the Court determines circumstances warrant otherwise.  (Doc. 45 at 10.)  Mr. Hegi has previously stated, under the penalty of perjury, that he has "no unique knowledge concerning the facts or circumstances" of Mr. Voelker's dismissal.  (Doc. 43-3.)  Contrary to Mr. Voelker's assertion, the mere fact that Mr. Hegi was copied on unredacted emails produced by BNSF does not render this assertion false.  The Court finds no reason to reconsider its prior Order (Doc. 45) and Mr. Voelker remains barred from deposing Mr. Hegi.[8]

**Accordingly, the Court will deny BNSF's request for a protective order as to the depositions of Ms. Ahern and Mr. Wunker but grants it to the extent it seeks continued protection from any deposition of Mr. Hegi.  Any depositions of Ms. Ahern and Mr. Wunker shall occur on or before November 30, 2020.**

## IV.   BNSF's Motion for Protective Order Quashing Depositions of Lawler, Ramos, Harvey & Wilson (Doc. 85).

BNSF seeks an order preventing Mr. Voelker from deposing Jill Lawler, Lisa Ramos, Rebecca Wilson, and Linda Harvey on the basis that they had "no direct involvement" in Mr. Voelker's termination and that such depositions would

---

[8] The Court also notes that because BNSF did not stipulate to the deposition of Mr. Hegi nor did Mr. Voelker move this Court for an alteration of it prior order (Doc. 45), Mr. Voelker should have never served a notice of deposition on BNSF for Mr. Hegi.  This conduct directly defies a prior order of the Court and Mr. Voelker is warned to not try and circumvent the Court's limiting discovery orders in the future.

impermissibly seek Rule 30(b)(6) evidence.  (Doc. 86 at 3–5.)   While BNSF

provides nothing other than conclusory assertions in support of this position, Mr.

Voelker only argues that Ms. Lawler, Ms. Ramos, and Ms. Wilson possess relevant

information regarding topics identified in his 30(b)(6) notice.  (Doc. 96 at 11–14.)

Because the Court has previously granted Mr. Voelker's motion to compel (Doc.

56) designation of 30(b)(6) deponents on these topics, it will grant BNSF's motion

for a protective order as to the deposition of these individuals.  (Doc. 92 at 26–32.)

With respect to Ms. Harvey, however, Mr. Voelker contends that she

possesses independently relevant information.  Specifically, Mr. Voelker argues

that Ms. Harvey has personal knowledge regarding the circumstances surrounding

BNSF's internal investigation of him and his eventual termination, including

information regarding "the issue of retaliatory intent and BNSF's negligent

mismanagement.  (Doc. 96 at 8.)  BNSF denies this is the case.  (Doc. 108 at 3.)

To ensure the discovery of any relevant information Ms. Harvey may possess, the

Court will permit Mr. Voelker to conduct a deposition of Ms. Harvey, but it shall

not exceed two hours in length.  This limited scope is consistent with the Court's

prior rulings regarding a deposition of Ms. Harvey.  *See, e.g., Wooten v. BNSF Ry.*

*Co.*, 2018 WL 2417858, *17–18 (D. Mont. 2018) (CV 16–139–M–DLC–JCL).

**Accordingly, the Court grants BNSF's motion (Doc. 85) as to Ms.**

**Lawler, Ms. Ramos, and Ms. Wilson, but denies it as to Ms. Harvey and will**

**permit Mr. Voelker to take her deposition on the condition that it does not**

**exceed two hours and occurs on or before November 30, 2020.**

### V.   Mr. Voelker's Third Motion to Compel (Doc. 87).

In Mr. Voelker's Third Motion to Compel (Doc. 87), he seeks an order

compelling BNSF to: (1) produce certain documents and other ESI sought in prior

discovery requests and identified in previous depositions; (2) produce investigation

outlines provided to Benjamin Marx; and (3) make Nancy Ahern and Barry

Wunker available for depositions.  (Doc. 87 at 1–2.)  As previously set forth in this

Order, the Court has denied BNSF's motion for a protective order as to the

depositions of Ms. Ahern and Mr. Wunker.  As such, the Court need only

determine whether it should compel production of the information categorized in

item one and the outlines sought in item two.

With respect to item one, it appears the documents and ESI Mr. Voelker

seeks include: (1) "documents and ESI circulated to BNSF's Claims and

Operations Departments who participated in the initial discussions and decisions

about whether the notice Voelker for an investigation";[9] (2) any internal

---

[9] In other portions of Mr. Voelker's supporting brief, he characterizes this information as both documents circulated to BNSF employees and the emails in which such information was circulated.  (Doc. 88 at 4.)  BNSF responds by stating that any relevant emails were produced by it for *in-camera* review as to Mr. Voelker's first motion to compel.  (Doc. 98 at 18.)  To the extent any emails are implicated, and such emails have been produced in unredacted form, BNSF shall provide them to Mr. Voelker only to the extent this Court has found they are not privileged above.

communications within EPTS that initiated an investigation into his conduct.
(Doc. 88 at 2–3.)  The Court finds that this information is clearly discoverable.

Any documents reviewed by BNSF officials during initial discussions and deliberations regarding a possible investigation of Mr. Voelker are clearly relevant to the question of whether his termination was unlawful.  Additionally, the relevancy of any information entered into EPTS in order to initiate an investigation of Mr. Voelker is beyond debate.  BNSF's own employee has testified in his deposition that any EPTS entry would have contained a description of relevant events, specific policy or rule violations, and the basis for the investigation.  (Doc. 88-4 at 5–6.)  Mr. Voelker is entitled to this information and the Court will compel its production.

With respect to item two, Mr. Voelker seeks to compel production of any outlines provided by Mr. Cargill to Mr. Marx.  (Doc. 88 at 3.)  Previously in this Order, the Court denied BNSF's request for a protective order as to Mr. Voelker's Request for Production No. 162 which seeks any outlines generated by Mr. Marx himself.  (Doc. 82-1 at 24.)  As noted above, despite this similarity, because Mr. Voelker's instant request seeks any outlines provided *to* Mr. Marx by Mr. Cargill, separate attention is warranted.   This conclusion is buttressed by the fact that BNSF argues that any outlines provided *to* Mr. Marx are protected by the work-

product doctrine but levels no such objection with respect to outlines prepared by *Mr. Marx himself*.  (Doc. 98 at 19–22.)

As a threshold matter, the Court must address the applicability of the work-product doctrine to the outlines in question.  BNSF argues that because the outlines Mr. Voelker seeks were actually prepared by its attorney, Andrea Hyatt, they are protected by the work product doctrine, but has agreed to produce them for *in-camera* review.  (*Id.*)  Mr. Voelker maintains that BNSF has waived any work-product protection and additionally

Here, BNSF represents that after searching for the outlines in question for some time, they were finally discovered and the fact that BNSF believed they were protected by the work-product doctrine was immediately communicated to Mr. Voelker's counsel.  (Doc. 98 at 21–22.)  It does not appear BNSF ever documented the outlines in a privilege log.  Mr. Voelker argues this failure constitutes a waiver to any claim of work-product protection.  (Docs. 88 at 7–8; 106 at 9–10.)  The Court disagrees.

While certainly the best practice, production of a privilege log is not required to preserve the protections offered by the work-product doctrine.  *See In re Grand Jury Investigation*, 974 F.2d 1068, 1071 (9th Cir. 1992) (holding "we have previously recognized a number of means of sufficiently establishing the privilege, one of which is the privilege log approach").  Indeed, the Federal Rules

of Civil Procedure specifically provide that an express assertion of the work-product doctrine and a description of the protected documents is all that is necessary to invoke its protection.  Fed. R. Civ. P. 26(b)(5)(A).  Here, the record reveals BNSF expressly invoked the work-product privilege as to the outlines sought during Mr. Cargill's deposition.  (Doc. 98 at 22.)  This was sufficient to invoke the protection and successfully fend off any waiver argument.

As such, the Court will address the claim of work-product protection on the merits.  In order to do so, however, the Court finds that an *in-camera* review is warranted.  As such, BNSF will be ordered to file the outlines at issue under seal on or before November 23, 2020.  BNSF shall follow the same filing procedure utilized with respect to the emails that were the subject of Mr. Voelker's second motion to compel.  (*See generally* Doc. 92 at 35.)

**Accordingly, the Court will grant the motion (Doc. 87) to the extent it seeks production of: (1) ESI relied on by BNSF officials in determining whether to formally initiate an investigation of Mr. Voelker; (2) information entered into EPTS in order to initiate an investigation of Mr. Voelker; and (3) Ms. Ahern and Mr. Wunker for depositions.  The Court reserves ruling on the issue of the discoverability of any outlines provided to Mr. Marx until after the Court has conducted an *in camera* review.**

28

**VI.    BNSF's Motion for a Protective Order Regarding Interrogatories Contained in Plaintiff's Fourth and Fifth Set of Discovery Requests (Doc. 102).**

BNSF seeks a protective order as to the information sought in four interrogatories propounded by Mr. Voelker in his Fourth and Fifth Set of Discovery Requests.  (Doc. 102.)  Notably, the Court has already concluded in this Order that a protective order was unwarranted for most requests for production included in those same requests.  The Court reaches a similar conclusion here.

Specifically, the Court finds that BNSF's arguments in favor of a protective order as to Interrogatories Nos. 16–18 are without merit and amount to nothing more than a grievance that Mr. Voelker has already served too much discovery in this case.  Notably, Mr. Voelker is well within the permissible number of interrogatories a party may propound in a case.  Fed. R. Civ. P. 33(a)(1).  The Court will not issue a protective order because BNSF does not wish to participate in the discovery process and such a reason falls far short of supporting the good cause necessary to issue such an order.

With respect to Interrogatory No. 15, however, the Court agrees that the information sought is irrelevant even under the broad definition of relevancy applied in the discovery context.  Additionally, the request is unduly burdensome and overbroad to the extent it seeks the identity of everyone who viewed any communication related to a January 1, 2012 letter sent by Mr. Voelker to Carl Ice.

29

The Court will grant BNSF's request for a protective order as to Interrogatory No. 15.

**Accordingly, the Court denies BNSF's motion (102) as to Interrogatories 16–18 but will grant it as to Interrogatory No. 15.  BNSF shall provide all responsive information to Interrogatories 16–18 within seven days of this Order.**

Accordingly, IT IS ORDERED that the Mr. Voelker's Second Motion to Compel (Doc. 58) is GRANTED in part and DENIED in part, as set forth previously in this Order.

IT IS FURTHER ORDERED that BNSF's Motion for Protective Order Regarding Plaintiff's Fourth and Fifth Discovery Requests (Doc. 81) is GRANTED in part and DENIED in part, as set forth previously in this Order.

IT IS FURTHER ORDERED that BNSF's Motion for Protective Order Quashing Depositions of Ahern, Wunker & Hegi (Doc. 83) is GRANTED in part and DENIED in part, as set forth previously in this Order.

IT IS FURTHER ORDERED that BNSF's Motion for Protective Order Quashing Depositions of Lawler, Ramos, Harvey & Wilson (Doc. 85) is GRANTED in part and DENIED in part, as set forth previously in this Order.

 IT IS FURTHER ORDERED that Mr. Voelker's Third Motion to Compel (Doc. 87) is GRANTED in part and DENIED in part, as set forth previously in this

Order, with ruling reserved on the discoverability of certain outlines provided to Mr. Marx.

IT IS FURTHER ORDERED that BNSF shall produce for *in camera* review the outlines subject to Mr. Voelker's Third Motion to Compel (Doc. 87) on or before November 23, 2020.

IT IS FURTHER ORDERED that Mr. Voelker's Motion for a Protective Order Regarding Interrogatories Contained in Plaintiff's Fourth and Fifth Set of Discovery Requests (Doc. 102) is GRANTED in part and DENIED in part, as set forth previously in this Order.

IT IS FURTHER ORDERED that the Motions Deadline (fully briefed) in this case is RESET for December 23, 2020.[10]  The Court's previous scheduling orders remain in full force and effect in all other respects.

DATED this 17th day of November, 2020.

Dana L. Christensen, District Judge
United States District Court

---

[10] This means any motions for summary judgment or other motions delineated in Local Rule 7.1(d)(1)(B)(i) must be filed on or before December 2, 2020.

31