William G. Jungbauer
John D. Magnuson
David L. Tomenes, *pro hac vice*
YAEGER & JUNGBAUER BARRISTERS, PLC
4601 Weston Woods Way
St. Paul MN 55127
(651) 288-9500 – telephone
wjungbauer@yjblaw.com
jmagnuson@yjblaw.com
dtomenes@yjblaw.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| MARK VOELKER, | |
| Plaintiff, | Cause No. 9:18-CV-172-DLC |
| v. | **VOELKER'S STATEMENT OF DISPUTED FACTS AND ADDITIONAL FACTS** |
| BNSF RAILWAY COMPANY, a Delaware Corporation, | |
| Defendant. | |

Pursuant to Local Rule 56(a)(1), Plaintiff Mark Voelker submits this statement of disputed facts in opposition to BNSF's Motion for Summary Judgment:

1.      From April 27, 1979, to April 5, 2017, Plaintiff Mark Voelker was an employee of Defendant BNSF Railway Company.  Statement of Stipulated Facts, Doc. 16 ¶1.

**Response: Undisputed.**

2.      At the time the events that form the basis of Count I of his amended complaint in this matter occurred, Plaintiff Mark Voelker was a covered employee within the meaning of 49 U.S.C. § 20109.  Doc. 16 ¶2.

**Response: Undisputed.**

3.      Defendant BNSF Railway Company is a railroad carrier engaged in interstate commerce within the meaning of 49 U.S.C. § 20109.  Doc. 16 ¶3.

**Response: Undisputed.**

4.      Defendant BNSF Railway Company terminated Plaintiff Mark Voelker's employment on April 5, 2017.  Doc. 16 ¶4.

**Response: Undisputed.**

5.      In the subject time periods, Plaintiff was working as a switchman, conductor, or yardmaster in Whitefish, Montana and was a member of the International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART").  Deposition of Mark Voelker (12/20/17) at 59:14-60:9, Ex. 1.

**Response: Disputed. Plaintiff was not working as a yardmaster, as yardmaster jobs at Whitefish were abolished in 2001.**

6.     On January 1, 2012, Plaintiff sent a letter to Carl Ice, BNSF's president, regarding crew fatigue. Voelker depo. (11/20/19) 134:17-138:21 at Ex. 2; Letter at Ex. 3.

**Response: Undisputed.**

7.     While Plaintiff claims that on or about January 20, 2012, Plaintiff followed up on his letter to Carl Ice with an email to Michael Shircliff and Ricco Montini.  Voelker depo. 138:22-139:7 at Ex. 2.  Plaintiff has never produced any email to Shircliff and Montini in support of this allegation.

**Response: Disputed. Voelker's deposition testimony was that he sent correspondence to Carl Ice surrounding safety concerns he encountered because his concerns "would get stonewalled usually at the first line supervisor level or just beyond that and [the safety complaint] wasn't getting up to the people that were implanting [the changes.]" [Dkt. No. 130-2 Ex.2 Voelker Depo. p. 137:5-13.] Voelker never received a response from Carl Ice. His safety concerns were referred to Michael Shircliff who "was the regional vice president at the time." Shircliff indicated that BNSF had received his correspondence. See Plaintiff's Second Supplemental Responses to Defendant's Third Set of Request for Documents; YJB-Voelker (WB) 11088-11091.**

8.    Michael Shircliff left employment with BNSF and was replaced by Rance Randle in approximately February 2015.  Voelker depo. 11/20/19, 235:24-236:13 at Ex. 2.

**Response: Disputed. Plaintiff testified that Rance Randle was in position when Plaintiff was fired but does not state the date of the switch from Michael Shircliff to Rance Randle. [Dkt. No. 130-2 Ex. 2 Voelker Depo. 235:24-236:13.]**

9.    Rance Randle was the Regional Vice President for the North Region from February 2015 to June 2016 and then the Vice President Operations, North, beginning in June 2016.  Randle depo. (*Vasquez*, 12/12/19), 7:5-9; 6:11-25 at Ex.4.

**Response: Undisputed.**

10.   On July 28, 2015, and December 1, 2015, Plaintiff sent correspondence to Dan Fransen.  Voelker depo. Ex. 20 at Ex.3; Voelker depo 139:25-147:5 at Ex. 2.

**Response: Disputed. Plaintiff sent correspondence to Dan Fransen as he was continuously trying to avoid Plaintiff and would not allow Plaintiff to layoff for the meeting discussing safety items.  [Dkt. No. 130-2 Ex. 2 Voelker Depo. 139:25-152:15]**

11.   Dan Fransen was the General Manager of the Montana Division from December 2012 until February 2017.  Fransen depo. (*Jones* 9/13/19) 6:21-7:1 at Ex. 5.  He has not worked for BNSF since February 2017.  *Id*. at 7:2-9

**Response: Undisputed.**

4

12.     Jon Gabriel became the General Manager of the Montana Division in March 2017.  Declaration of Jon Gabriel at Ex. 6.

**Response: Disputed. Gabriel claims it occurred in February 2017. [Gabriel Depo. 6:13-17]**

13.     Ricco Montini is a Division Trainmaster in Whitefish, Montana.  In his job as Division Trainmaster, he does not make discipline decisions.  Montini Depo. (*Jones* 9/24/19) 5:13-14; 6:20-23; 41:21-42:1 at Ex. 7.

**Response: Disputed. Ricco Montini's job duties included overseeing train yard, and engine employees in Whitefish, MT, and if there are issues, he is the frontline person to go to so that the work is being done safely and efficiently. [Dkt. No. 130-7 Ex. 7  Montini Depo. 6:20-7:6.]**

14.     On February 18, 2016, Plaintiff sent an email to James Pino regarding a town hall meeting.   See email at Ex. 8.

**Response: Disputed. Plaintiff sent an email on February 18, 2016 to James Pino, Ricco Montini, William Reed, and Dan Fransen regarding safety concerns for yard service that needed to be addressed at the town hall. [Dkt. No. 130-8 Ex. 8].**

15.     James Pino is the Superintendent of Operations in Whitefish, MT. He started that position in December 2013.  Pino Depo. (*Wooten,* 6/27/2017) 7:3-5; 8:21-23 at Ex. 9.

**Response: Undisputed.**

16.    On December 29, 2016, Ryan Hedgecock sent an email to James Pino regarding snow tires.  Plaintiff was a recipient of this email, not the author.   See email at Exhibit 10.  See also Fransen depo. 83:5-11 at Ex. 5.

**Response: Disputed. Plaintiff forwarded Ryan Hedgecock's email to Kathy Nocona in agreement with the safety issues with winter tires on crew vans. [Fransen Depo. 82:23-24.]**

17.    Ryan Hedgecock is the chairman of the conductor's union in Whitefish (SMART-TD) and also a delegate for Whitefish Local 891.  Hedgecock depo. (*Jones* 12/5/2019) 25:11-12; 27:18-28:1 at Ex. 11.

**Response: Undisputed.**

18.    On October 6, 2016, Plaintiff completed a Safety Issue Resolution Process (SIRP) Reporting Form.  Voelker depo. Ex. 20 at Ex. 3.

**Response: Undisputed.**

19.    The 10/6/2016 SIRP was resolved within a couple months.  Voelker depo (11/20/19), 164:7-165:10 at Ex. 2.  Fransen agreed with the process for winter yard condition.  Fransen depo. 84:21-85:21 at Ex. 5.

**Response: Disputed. The SIRP was not resolved in a timely manner. It took BNSF months longer than was reasonably necessary to complete the repairs to the yard. Additionally, the repairs were not to the Plaintiff's**

satisfaction. [Dkt. No. 130-2 Ex. 2 Voelker Depo. 164:17-165:10.] James Pino is responsible for responding to SIRP's when they get put on the SIRP log and would have had direct knowledge of Voelker's history of submitting SIRPs. [Dkt. No. 130-5 Ex. 5 Fransen Depo. 90:15-23.]

20.     Plaintiff never assisted OSHA in an investigation.   Voelker OSHA Sworn Statement, p. 20:23-21:8; p. 30:17-31:5 at Ex. 12.

**Response: Disputed. The portion of the OSHA transcript that BNSF cites indicates that Voelker did assist in Wooten's OSHA investigation. [Dkt. No. 130-12 Ex. 12 Voelker OSHA Statement 20:23-23:4.] That portions reads:**

```
23          INVESTIGATOR: So let's talk about the
24  assisting in the investigation conducted by OSHA.
25  Kind of start at the beginning about how you kind
                                              Page 21
 1  of got brought into that investigation and what
 2  happened and kind of start at the beginning and
 3  we'll go from there.
 4          MARK VOELKER: Okay. I believe we're
 5  talking about the Zach Wooten investigation. I
 6  think it's the only OSHA investigation I've ever
 7  been involved in and a witness to, so to speak.
```

**Voelker's statement explicitly indicates that he viewed himself as a "witness" in the "OSHA investigation" into BNSF's termination of Wooten.**

21.    In 2015, Plaintiff was the switchman's general local chairman for SMART in Whitefish, Local 891.  Deposition of Mark Voelker (11/20/19) at 35, Ex. 2.

**Response: Undisputed.**

22.    Voelker alleges that he was discriminated against for reporting "crew fatigue" issues.  However, Voelker worked a yard job with scheduled hours and days off.   Voelker OSHA Sworn Statement, p. 6:6-12 at Ex. 12.

**Response: Disputed. Voelker reported hazardous safety conditions related to crew fatigue that were brought to him as the local chairman of the SMARTTD. Additionally, Voelker had seniority to hold both yard and road jobs and moved between them at his discretion. [Dkt. No. 130-2 Ex. 2 Voelker Depo. 134:17-25 to 136:1-22.]**

23.    Moreover, with respect to his complaints about yard conditions, BNSF developed a winter program where, with pay, Voelker and BNSF officials would inspect the yard and identify any potential hazards to be remedied.  Fransen depo. 84:21-85:21 at Ex. 5.

**Response: Disputed. BNSF had a Winter Action Plan developed not specific to Plaintiff's SIRPS or requests, and BNSF would not follow through with their own safety plan. No such inspections occurred. [Dkt. No. 130-2 Ex. 2 Voelker Depo. 134:16-25 to 138:1-16.]**

24.    In August 2015, Plaintiff was asked in his capacity as switchman's local chairman to assist in representing a conductor, Zac Wooten, in an investigation required by Wooten's collective bargaining agreement, concerning the cause of a personal injury and allegations of filing a false report.   Plaintiff's Amended Complaint dated 12/12/18 ¶11; Dep. of Voelker (11/20/19) at 108:14-18 at Ex. 2.

**Response: Disputed. The Amended Complaint states that Mr. Voelker was one of the representatives at Wooten's investigation and he continued to research the facts surrounding Wooten's injury in his role as a Union Representative. Voelker testified at his deposition consistent with the Amended Complaint. [Dkt. No. 8] During the Wooten investigation, certain evidence was not permitted to be introduced regarding defects on other locomotive doors, which Voelker considered a safety item that injured Voelker. [Dkt. No. 130-2 Ex. 2 Voelker Depo. at pp. 224:16-25 to 226:1-10.]**

25.    The Wooten investigation was held on September 11, 2015.  Dep. of Voelker (12/20/17) at 243 at Ex.1.

**Response: Disputed. Like Voelker, Wooten's investigation was postponed several times while BNSF's Law Department consulted with local officials on how to best accuse Wooten and Voelker of being liars. Wooten was injured on July 31, 2015, and the formal investigation did not take place until September**

**10, 2015.  [Dkt. No. 8 at p. 5, ¶ 11; Dkt. No. 130-13 Ex. 13 Wooten Dismissal Letter.]**

26.     Wooten was dismissed from employment on September 29, 2015. See letter of dismissal at Ex. 13.

**Response: Disputed.  Wooten's dismissal was subsequently determined to be unlawful by OSHA. Subsequently, a federal civil jury unanimously concluded that BNSF unlawfully retaliated against Wooten in violation of the FRSA. The same jury concluded that Wooten was injured on Locomotive 6867 while he was on duty.**

27.     Although a different union, the Brotherhood of Locomotive Engineers, was going to handle Wooten's appeal pursuant to the applicable CBA provisions, Plaintiff agreed to write the first draft of an appeal letter to BNSF's General Manager, Dan Fransen.  Dep. of Voelker (11/20/19) at 122:21-125:3 at Ex. 2; Dep. of Voelker (12/20/17) at 83:9-84:16 at Ex.1.

**Response: Disputed. The BLET handled Wooten's appeal under the CBA, but SMARTTD was assisting with that appeal since they represented Voelker at the investigation. [Dkt. No. 130-2 Ex. 2 Voelker Depo. at p. 122:21-23.] Voelker's testimony was that any documents provided to Wooten's counsel "was also sent to the representatives, and it was sent to the general chairman on the BLE side for appeal." [*Id*. at p. 123:14-23.]**

28.     On the morning of October 28, 2015, Plaintiff accessed BNSF's proprietary data management system—Transportation Support ("TSS")—with a specific command function, Locomotive Inquiry ("LINQ") to access information concerning BNSF locomotives.   Email from Plaintiff to Mr. Jungbauer *et al* dated 10/28/15, Exhibit 117 at Ex.14, to Dep. of Voelker (12/20/17) at 78:6-80:4 at Ex.1.

**Response: Disputed. Plaintiff accessed a LINQ and emailed it to Wooten's counsel to assist in Wooten's appeal. [Dkt. No. 130-14 Ex. 14 Email from Plaintiff to Mr. Jungbauer *et al* dated 10/28/15; Dkt. No. 130-1 Ex. 1 Voelker Depo. 79:24-80:9.]**

29.     The TSS system contains many different kinds of command functions and BNSF employees are provided access to various command functions based upon their job duties.  Dep. of Voelker (11/20/19) 112:13-113:10 at Ex. 2.

**Response: Undisputed**

30.     The TSS system could be accessed at BNSF offices or remotely, including from home.  When the TSS system was first accessed, instructions are presented, stating:

> Please read before logging on. This computer system is the property of Burlington Northern Santa Fe. By logging on, each user consents that the company or its designees my inspect, copy, or disclose any email, electronic communications, or other information on this system at any time without further notice Only authorized users are allowed to access the system and any data on it. And the system is to be used only for valid business purposes or as authorized by management. Unauthorized

access, use, dissemination may be grounds for disciplinary action up to
and including termination.

Dep. of Voelker (11/20/19) at 110:20-111:18 at Ex. 2.  Voelker acknowledged that

he has seen the screen when logging onto TSS.  Investigation Transcript p. 71:12 to

72:4 at Ex. 15.

**Response: Disputed. Voelker's testimony was that the screen appeared
sometimes and other times it was blank. [Dkt. No. 130-2 Ex. 2 Voelker Depo.
115:1-9.] Voelker's testimony is unclear as to whether the TSS screen appeared
on October 28, 2015, or at any other relevant date in this litigation. Voelker
does not dispute BNSF's recitation of the boilerplate "flash screen."**

31.    On October 28, 2015, Plaintiff accessed the LINQ system for the

purpose of reviewing the locomotive information, reporting, and repair history for

the locomotive that Wooten alleged to have caused his injury in July 2015.  Dep. of

Voelker (12/20/17) at 78:6-82:23 at Ex. 1.

**Response: Disputed. Plaintiff accessed the information as he was
concerned about the safety item that was supposed to have been reported. [Dkt.
No. 130-1 Ex. 1 Voelker Depo. 82:2-7.]**

32.    On October 28, 2015, while on duty at the Whitefish yard, Plaintiff

again accessed the LINQ command and printed several reports from it concerning

that locomotive. *See* Exhibit 15 at Ex. 16, Dep. of Voelker (11/20/19) at 102:13-

103:9 at Ex. 2; Exhibit 18 at Ex. 17.; Dep. at 127:10-20 at Ex. 2.

12

**Response: Disputed. Plaintiff only accessed the LINQ report concerning the locomotive on October 28, 2015. Plaintiff printed off the reports on November 5, 2015. [Dkt. No. 130-16 Ex. 16]**

33.    Plaintiff provided his draft appeal letter to the other union representatives on October 26.  Email from Voelker to Wetsch and Hedgecock dated 10/26/15, Exhibit 18.  By October 28, 2015, Plaintiff had already "washed his hands" of the case.  Voelker OSHA Sworn Statement, p.35:14-18 and 40:17-41:1 at Ex. 12.

**Response: Disputed. Wetsch, Moran, Voelker, Hedgecock, and McPhee were working on Wooten's appeal and circulating drafts of the appeal letter. In one instance, Tom Moran writes to Voelker "Good catch on the door latch." Clearly, information regarding the LINQ and door latch was being discussed as part of the BLET appeal and Voelker, as a ghost writer, was actively involved in that process. Voelker continued to be included on BLET correspondence regarding drafting Wooten's appeal until October 28, 2015. [Dkt. No. 130-18 Ex. 18 at pp. 1-2.]**

34.    The appeal letter was finalized and sent to General Manager Fransen on October 28 and never mentioned information from LINQ.  See Union Appeal Letter at Ex. 19.

**Response: Disputed. The Union Appeal Letter states that knowing [Stauffer's] background in the mechanical department as well as his urgency to**

**end discussion on the matter leads us to speculate that there may be more to discover on this topic. This includes the information from the LINQ report. [Dkt. No. 130-19 Ex. 19 Union Appeal Letter at pp. 5.] Additionally, information contained in the letter needed to be verified as factual, and Plaintiff in good conscious could not make it a fact without verification until Plaintiff could confirm the door was the same door where Wooten was injured..**

35.     A subsequent appeal, dated January 18, 2016, of Fransen's decline of the appeal did not mention information from LINQ.  Exhibit 20.

**Response: Disputed. This letter was written by Wilson not Voelker, and the information contained in the letter needed to be verified as factual, and until Plaintiff could confirm the door was the same door Wooten was injured on Plaintiff in good conscious could not make it a fact without verification. Additionally, October 28, 2015 correspondence was received as an exhibit in the Wooten trial at Exhibit No. 44. Wooten's counsel explicitly argued that the door latch was defective to the jury and mentioned Voelker by name at [Wooten Transcr. 2893.]**

36.     On November 5, Plaintiff again accessed the LINQ command to review the data for the subject locomotive and printed a report.  Exhibit 15 at Ex. 16, Dep. of Voelker (11/20/19) at 102 at Ex. 2; Exhibit 18 at Ex.21; Dep. Of Voelker (11/20/19) at 127 at Ex. 2.

14

**Response: Disputed. Mark Voelker's correspondence is dated November 2, 2015. To the extent that a LINQ is dated November 5, 2015, it is unclear when Voelker provided the correspondence.**

37.     On or about this date, Plaintiff sent the LINQ printouts dated October 28 and November 5 to Mr. Wooten's attorney, Mr. Jungbauer.  Voelker (11/20/19) Exhibit 15 at Ex. 16, at 102,105-106; 121-23; 132-33 at Ex. 2.   Plaintiff did not provide copies of these printouts to anyone other than Jungbauer.   See letter to Bill Jungbauer at Ex. 16.  By the time he printed out the LINQ reports, the union appeal on behalf of Mr. Wooten was already submitted.   Fransen letter of 12/14/15, re: postmark of 10/28/2015 at Ex.22.

**Response:   Disputed.   Plaintiff   had   conversed   with   the   other representatives of Wooten about the printouts, and other representatives had access to TSS so there was no need for mailing. Additionally, the Union Appeal had not been completed by the time Voelker provided the documents to Jungbauer.**

38.     It was not until after Jungbauer's office produced the printouts in civil litigation between Wooten and BNSF (CV 16-139-M-DLC-JCL) that BNSF learned Plaintiff had printed and provided them to Jungbauer.   See formal investigation, 20:24-21:5; 24:26-25:3; 48:25-49:7 at Ex. 15.

**Response: Undisputed.**

39.     At the time he produced the LINQ screenshots to Jungbauer, Plaintiff was not aware of an actual OSHA investigation. Voelker OSHA Sworn Statement at 40:14-41:13 at Ex. 12.

**Response: Disputed. When Voelker provided the LINQ, he already knew that Wooten "was going to file a FRSA case" and "knew [he] would probably more than likely be a witness because of what I found there." [Dkt. No. 130-12 Ex. 12 Voelker OSHA Statement at p. 40:10-13.] Voelker knew that Wooten had retained counsel on his FRSA and FELA claims when Voelker provided the LINQ "[as] essentially a witness in this case…" [*Id.* at p. 39:19-21.] When Voelker provided the information, Voelker was under the impression that Wooten "was gathering information" in support of his FELA and FRSA claims. [*Id*. at p. 41:6-8.]**

40.     Plaintiff "d[id]n't know uh what relationship Mr. Wooten and Mr. Jungbauer had at that point."  Volker Formal Inv. at p. 86:17-19 at Ex. 15. This testimony is contrary to Voelker's sworn statement to OSHA Investigator that "Zach [sic] had retained them [Jungbauer law firm] to represent him.  And I believe for the OSHA case, the FRSA case as well as the FELA case."  Voelker OSHA Sworn Statement p. 34-35; 40:14-23 at Ex. 12.  See also Voelker depo. (Wooten), where he sent the records to the "Yaeger law firm" because they were retained to represent Mr. Wooten.  Voelker depo (2017), p. 79:24-80:4 at Ex. 1.

**Response: Disputed. Pino and BNSF believed that Voelker "violated [company] policy and pro (sic) had provided organizational information as outlined and defined by this policy when he shared uh information on the BNSF 6867 with them with intent, uh as they were uh representative attorney in civil litigation against the BNSF on behalf of Mr. Zac Wooten." At his investigation, Voelker testified that when Wooten was dismissed, "he retained counsel under the Federal Employees (sic) Liability Act", which was Jungbauer. [Dkt. No. 130-15 Ex. 15 Invest. Tr. 63:3-5.] Wooten relayed to Voelker that "he retain[ed] the attorney, uh that his file, his investigation file, when we were completed with it should go to his attorney." [*Id*. at 63:3-21.]**

41.    Plaintiff never spoke with any OSHA representative about the screenshots until he was interviewed as part of his own § 20109 claim.  Voelker OSHA Sworn Statement at 30:17-31:5 at Ex. 12.  He did not speak to OSHA for Wooten's investigation.  *Id*., p. 20:23-21:8; 30:17-31:5.

**Response: Disputed. Voelker provided the information to Wooten's counsel, who utilized the information to prosecute Wooten's successful claim at OSHA and successful FRSA claim in federal court. [Wooten Trial Tr. at pp. 2983.]  Wooten's counsel provided BNSF with correspondence outlining the purpose of providing the information on December 19, 2016.**

42.     Once Plaintiff's supervisors learned of the unauthorized providing of LINQ printouts to Jungbauer, a notice of formal investigation was sent to him pursuant to Plaintiff's CBA, setting the formal investigation for December 22, 2016. Exhibit 5, Deposition of Ben Marx (11/21/19) at Ex. 23.

**Response: Disputed. BNSF violated Plaintiff's CBA by not sending the notices by certified mail and he never received the notice properly. [Dkt. No. 130-15 Ex. 15 Voelker Formal Investigation.]**

43.     On December 15, 2016, a Notice of Investigation was issued to Plaintiff for "the purpose of ascertaining the facts and determining your responsibility, if any, in connection with your alleged misconduct and failure to comply with instructions when you allegedly disclosed confidential BNSF business information concerning a BNSF locomotive to an unauthorized person on or about October 28, 2015, via your personal email account or otherwise." See Notice of Investigation 12/15/2016 at Ex. 24.

**Response: Disputed. Voelker testified that the purpose of the investigation was to use it as "a retaliation or an intimidation vehicle, maybe even a harassment vehicle, of me or every other local chairman across the…BNSF system and maybe across the country and Class 1 railroads. I believe it was maybe even a harassment issue with me personally with the**

**company witness in this investigation." [Dkt. No. 130-2 Ex. 2 Voelker Depo.
99:12-25 to 100:1-25.]**

44.     The investigation was postponed three times. See postponements dated
12/21/2016, 1/23/2017; and 3/15/2017 at Ex. 25.

45.     **Response: Disputed. Voelker's investigation was postponed three
times on the dates indicated above. On January 9, 2017, over two weeks after
the first postponement, Andrea Hyatt acknowledged that the railroad was
having a "struggle trying to get a witness to testify about *why* the information
in TSS is confidential." [BNSF/Voelker 1020-37.] In other words, when the
investigation was postponed on December 21, 2016, BNSF had not yet identified
who could testify against Voelker regarding Pino's novel interpretation of
BNSF's vague and ambiguous policies, rules, and procedures. BNSF would
again postpone the investigation on March 15, 2017 while it attempted to find
additional witnesses to fit Pino's novel interpretations of company policy.
Similarly, in the *Wooten* case Nancy Ahern testified that these documents were
confidential so that they did not fall into the "wrong hands", like the "Taliban".
[Ahern Depo in Wooten at p. 165:3-11.] Cargill testified that termination
decisions should be made after "evaluating what it is that he sent, the
information where he got it from, who he sent it to. And then weigh that against,**

19

you know, the language of the confidentiality policy." [Cargill Depo. at p. 115:3-12.]

46.    An investigation was held on March 22, 2017.  See Transcript and exhibits at Ex. 15.

**Response: Undisputed.**

47.    The records from TSS that Plaintiff sent to Jungbauer were not part of the investigation transcript and the investigation was closed when Plaintiff pulled the TSS documents.  Voelker depo. 106:25 – 108:12; 124:7-16 at Ex. 2.

**Response: Disputed. The records Voelker provided to Wooten's FELA and FRSA counsel were made part of Voelker's investigative transcript as Exhibit No. 15. [Dkt. No. 130-15 Ex. 15 159-169.] Voelker's investigation had not yet been scheduled when Voelker retrieved the LINQ on October 28, 2015 because the investigation took place on March 22, 2017. Additionally, the investigative hearing for Wooten may have been closed but the case was still ongoing when Voelker accessed the LINQ in TSS. [Dkt. No. 130-2 Ex. 2 Voelker Depo. 108:2-13.]**

48.    Plaintiff admitted he was never authorized to send LINQ printouts to Jungbauer.  Voelker (11/20/19) at 117-120 at Ex.2.  Investigation testimony p. 77:22-25 at Ex. 12.  Voelker depo. 119:14-120:1 at Ex. 2.  Voelker never took any

steps to determine if Jungbauer law firm was an authorized person.  Depo 120:2-12 at Ex. 2.

**Response: Disputed. Voelker testified that "there's a congressional act that handles railroad injuries, Federal Employers Liability Act. I know it lists authorizations in there. And I'm not exactly sure if they are or aren't authorized or unauthorized." [Voelker Depo. at p. 118:15-20.] BNSF never trained Voelker, Pino, Marx, Hedgecock, or any other witness in this case on Section 60 of the FELA. Based upon Voelker's understanding of the FELA and his role as a union representative to make the disclosure, he felt he did not need to obtain employer authorization for the information shared. [Dkt No. 130-15 Ex. 15 Invest. Tr. 77-78.]**

49.    Plaintiff is not aware of ever having provided TSS printouts to a third party before he provided the screenshots to Jungbauer.   Voelker depo. (2019) 113:11-25 at Ex. 2.

**Response: Disputed. Documents in TSS that contain locomotive defects are uploaded and shared with competitors via UMLER and Railinc.  [Wetsch Depo. at p. 5:8-23; Hedgecock Depo. at p. 5:14-25 to 6:1-4; Fingar Depo. at p. 37:10-17, 381-16.] Plaintiff's testimony was that he did not know either way if he had in the past. [Dkt. No. 130-2 Ex. 2 Voelker Depo. 113:17-18.] Specifically, Fingar's testimony was that other railroads would receive: "[a]nything safety**

21

related that would cause an injury, they're obligated to report it to mechanical or their supervisor to get the appropriate safeguards against that." [Fingar Depo. at p. 44:19-25 to 45:1-3.]

50.    Plaintiff never reported to BNSF that he had sent LINQ screenshots to Jungbauer.  Voelker depo. (Wooten case) 81:25-82:23; 85:6-16 at Ex. 1.

**Response: Disputed. Voelker is a trained professional with a level of independence of what he does as a union representative for his members. Voelker need not inform the railroad every time Voelker takes a step to further representation of his union members during the company's internal adversary investigative process.  Additionally, BNSF's citations refer to the reporting of the safety concern not being reported on the LINQ report, not the fact that he sent the LINQ report to another person.**

51.    In his formal investigation, Plaintiff contended that his acts were authorized by the CBA and the Railway Labor Act: "Uh the uh reasoning for my email was to send this information to the holders of the transcript. Uh the reason we do this is under the Railway Labor Act, we have the uh remedy of uh appeals, and that information, even though it wasn't sent in a transcript or wasn't included in the transcript, it is a verification or an offer of proof um to as to the wording in the transcript." Transcript of Investigation held 03/22/2017 I ("Voelker Inv."), at 73:24-74:3 at Ex. 15.

**Response: Disputed. Voelker also testified that he provided the information because "ether was a gross safety negligence with Mr. uh Wooten's case when it was discovered that this door handle was indeed loose as we alluded to in the uh and and argued in the investigation itself." [Dkt. No. 130-15 Ex. 15 Voelker Invest. Tr.  73:17-23.]**

52.   Plaintiff's CBA provides in pertinent part:

RULE 51. Investigations.

(a). An employee whose name has been listed on the seniority roster as permanently employed under the provisions of Rule 33, or any employee involved with other employees in matters involving insubordination, infraction of rules, damage to equipment or personal injury, shall not be disciplined or dismissed or given record suspension without a full and impartial investigation of the circumstances, unless waiver of such investigation is submitted to the investigating officer in writing.

(b). At the investigation, he may be represented by one or more employees of his choice, and at which he may present the testimony of such witnesses as he may desire, and hear all testimony submitted at the investigation. He may, however, be held out of service pending such investigation, and, if discipline be assessed, the period so held from service shall be included in any disciplinary period thereafter involved.

(c). Notice of such investigation, stating the known circumstances involved, shall be given to the employee in writing within seven (7) calendar days of the date that knowledge of the offense or irregularity has been received by the Superintendent, Trainmaster or Yardmaster in charge, an investigation will be held within seven (7) calendar days of such notice.

(d). A decision will be rendered, and any employee held responsible will be notified in writing of such decision, within twenty (20) calendar days after completion of investigation, but no employee will be held from service awaiting decision in excess of ten (10) days.

(e). Investigation shall be held, so far as possible, at the home terminal of employees involved, and at such time as to cause employees a minimum loss of rest or time. When necessary to secure presence of witnesses or representatives not immediately available, reasonable postponement at the

request of either the Company or employee may be had, but, in any event, such investigation shall be held within thirty (30) days of the date of notice.

RULE 52. Appeals.

An employee dissatisfied with decision shall have the right of appeal, either in person or through his representatives, to the next higher proper officer, providing written notice is made to such officer, and a copy furnished to the officer whose decision is appealed, within sixty (60) days of the date of advice of decision. Employees shall have the right of further appeal in the regular order of succession, in the manner prescribed, up to and inclusive of the highest official designated by the Railway to whom appeals may be made. Each such appeal shall be taken within sixty (60) days of the date of final decision in writing by the officers with whom matter is being handled; but such sixty (60) day limitation shall not be deemed to apply to the period during which such appeal is under consideration by each successive officer. If decision of the highest designated official is unsatisfactory, appeal may be had to the National Railroad Adjustment Board, or other similar tribunal, except that such appeal shall be barred unless, within one (1) year from the date of said officer's decision, proceedings are instituted by the employee or his duly authorized representative. It is understood, however, that the parties may, by agreement in any particular case, extend the one (1) year period herein referred to.

RULE 53. Discipline.

If decision results in suspension or dismissal, it shall become effective as promptly as necessary relief can be furnished, but in no case more than five (5) calendar days after notice of such decision to the employee. If not effected within five (5) calendar days, or if employee is called back to service prior to completion of suspension period, any unserved portion of the suspension period shall be cancelled.

RULE 56. Grievances.

An employee who considers himself unjustly treated under the provisions of this schedule, may, within seven (7) calendar days of the cause of such complaint, file written request with his appropriate supervising officer for an investigation of the circumstances; whereupon investigation within seven (7) calendar days thereafter will be held in the manner provided in Rule 51. Decision after such investigation, and appeals thereafter from such decision, will in like manner be rendered or had in accordance with further provisions of Rules 51, 52, and 53.

Collective Bargaining Agreement at Ex. 26.

**Response: Disputed. This an old version of the CBA not the current Universal Investigation Agreement Plaintiff was under at the time of investigation.**

53.    The investigation was also governed by the Memorandum of Agreement Between Burlington Northern Railroad Company and the United Transportation Union (GNY) dated July 23, 1996.  Ex. 27.

**Response: Undisputed.**

54.    The Memorandum of Agreement states:

(5) Forty-eight (48) hours in advance of the hearing the Carrier and the individual identified as the accused employee's representative will exchange all records, documents, locomotive recorder tapes, etc., as well as any other items to be used as exhibits at the investigation, to allo9w both parties to prepare for the hearing.

See Memorandum, Exhibit 21 at Ex. 27, p. 2, to Voelker's depo.

**Response: Undisputed.**

55.    Pursuant to said CBA provisions, Plaintiff did not waive the investigation, which was held on March 22, 2017, pursuant to the fourth investigation notice dated March 15, 2017, after three prior postponements.  Voelker Formal Inv. at 9 at Ex. 15.

**Response: Undisputed.**

56.     In the Wooten v. BNSF civil case, Jungbauer's firm made a motion for a preliminary injunction or temporary restraining order to prevent BNSF from proceeding with the investigation.  *Wooten v. BNSF,* 9:16-DV-139-DLC, Doc. 14 (1/11/17).

**Response: Undisputed.**

57.     Jungbauer's firm renewed the motion.  *Id.* Doc. 30 (3/01/17).  When counsel for the parties in the Wooten case appeared before the Court on January 24, 2017, for an otherwise scheduled pretrial conference, the Court "engaged in a brief, off-the-record conversation on that motion, during which it <u>inquired</u> whether Wooten's concern about the chilling effect of the investigation would be satiated by postponing the investigation until after a final resolution of this matter." [Emphasis added.] *Wooten v. BNSF*, 9-16-CV-139-DLC, Doc. 31, p. 7.

**Response: Undisputed.**

58.     The motion was referred to the magistrate, who on March 16, 2017 denied it, finding that "The possibility that allowing BNSF to pursue its investigation against Voelker may have a general chilling effect and deter union leaders from assisting union members with injury claims in other cases is simply too speculative to support a temporary restraining order or preliminary injunction."  2017 U.S. Dist. LEXIS 40551.

**Response: Disputed. Since then, employees of BNSF have come forward and explicitly said that how BNSF disciplined Voelker has had a chilling effect. [Hedgecock Deposition at 12-13]**

59.    Wooten filed objections with this Court, which adopted the Magistrate's Findings and Recommendation. 2017 U.S. Dist. LEXIS 40564.

**Response: Undisputed.**

60.    The investigation was conducted by Ben Marx, a senior manager of intermodal and automotive operations for the northwest region.  Marx Dep. at 6:8-10 at Ex. 28; Voelker Inv. at 1:1-5 at Ex. 15.

**Response: Undisputed.**

61.    James Pino testified at the investigation that "BNSF Railway goes to great lengths to ensure that all employees understand the Privacy Policy um pertaining to the TSS application, and um prior to any employee accessing um the TSS mainframe, on any given date, when they attempt to um enter into the  TSS Express or to the TSS mainframe, Transportation mainframe, they are given a notice prior to logging in that they're required to read, which informs them of the privacy of the information once they log on to the access."  They can access TSS from a BNSF computer or a home computer or home device.  The notices appears regardless of the format that is used to access TSS.  Investigation p. 26:23-27:4; 28:12-26 at Ex.15, investigation exhibits 8 and 9 at Ex.15.

27

**Response: Disputed. BNSF did not provide any training to the relevant witnesses in this case regarding TSS, LINQs, its Confidentiality policies, or how they interact with one another. The TSS Screen was sometimes blank.**

62.     General Code of Operating Rule 1.6 states:  Conduct. Employees must not be: careless of the safety of themselves or others; negligent; insubordinate; dishonest; immoral; quarrelsome, or discourteous. Any act of hostility, misconduct, or willful disregard or negligence affecting the interest of the company or its employees is cause for dismissal and must be reported. Indifference to duty, or to the performance of duty, will not be tolerated.    Investigation Transcript, 39:20-40:1 at Ex.15; Investigation exhibit 14 at Ex. 15.

**Response: Undisputed.**

63.     General Code of Operating Rule 1.13 states: Reporting and Complying with Instructions. Employees will report to and comply with  instructions from Supervisors who have the proper jurisdiction. Employees will comply  with instructions issued by managers of various departments when the instructions apply to their duties.  Investigation Transcript, 31:18-22 at Ex. 15; Investigation Ex. 1 at Ex. 15.

**Response: Undisputed.**

64.     General Code of Operating Rule 1.27 states:  Employees who make up, handle, or care of any of the following must not allow an unauthorized person to

access them or disclose any information contained in them, and it goes through correspondence, reports, books, Bills of Lading, Waybills, Tickets, Statistics. Investigation Transcript 38:26-39:5 at Ex. 15; investigation exhibit 13 at Ex. 15.

**Response: Undisputed.**

65.    During the investigation, Plaintiff admitted to having sent LINQ printouts to Jungbauer and his paralegal.  Voelker Inv. at 62, 65, 74, 112, 121 at Ex. 15.  PLB at Ex. 29, p. 1-2: "The Claimant had accessed information regarding a certain locomotive through the Transportation Support System "TSS" application using the locomotive inquiry command "LDINQ" [sic].  He sent this information to Jungbauer."   "The Claimant confirmed that, although he was an authorized user of the TSS application he was not authorized to disseminate information from TSS to Wooten's attorney" and that "the above facts are not in dispute." Voelker depo 11/20/19, 105:24-106:5 at Ex. 2.

**Response: Disputed. Attorneys are authorized under federal law, not corporate policies.**

66.    James Pino, Plaintiff's BNSF supervisor, testified that those persons were not authorized to receive such information. Voelker Inv. at 18:18-23 at Ex.15.

**Response: Disputed. Pino does not have the education and legal background to determine who is authorized.**

67.     Plaintiff's contention in the investigation was that the LINQ materials were "disseminated well within my rights as a union representative and a member's rights as well under the auspices of the Railway Labor Act."  Voelker testimony, Voelker Inv. at 121:23-25 at Ex. 15.

**Response: Undisputed.**

68.     He further contended:

"The Railway Labor Act is clear. Carriers cannot refuse, limit, or dictate representation or how it is done. Members have the right to representation and representatives have the right to fully and aggressively represent their membership without fear of any retaliation, intimidation, or harassment from the Carrier or its agents."

Formal Investigation, p. 122:10-15 at Ex.15.

**Response: Undisputed.**

69.     Before Plaintiff was dismissed, BNSF's Labor Relations Department, Stephanie Detlefsen, Director of Employee Performance reviewed the formal investigation transcript with exhibits and supported a standalone dismissal. Detlefsen did not have knowledge of any of Plaintiff's alleged protected activities. See Declaration of Detlefsen at Ex. 30.

**Response: Disputed. Detlefsen has access to any and all records of an individual that they are considering for termination through normal channels within the company and should have asked about any potential protected**

activities associated with the case. **Detlefsen worked closely on Cargill's team and Cargill was involved very early in Voelker's investigation.**

70.    Jon Gabriel, Montana Division General Manager at the time, also reviewed the transcript with exhibits and made the decision to dismiss Plaintiff. Declaration of Jon Gabriel, Ex. 6.   Gabriel did not have knowledge of any of Plaintiff's alleged protected activities.  *Id.*

**Response: Disputed. Gabriel did not make the decision to dismiss Plaintiff till after Detlefsen had already made the decision to support dismissal. [Dkt. No. 130-6 Ex. 6 Declaration of Jon Gabriel.]**

71.    Pino neither was the person who decided to hold the investigation, nor did he make the decision to dismiss Plaintiff.  Pino depo. 34:17; 203:14-16 at Ex. 9.

**Response: Disputed. Inferences strongly suggest that Pino, or someone in his position, made a request in EPTS for an investigation into Voelker's alleged conduct to occur. As Rick Stauffer testified, someone at BNSF, like Pino, needed to request an investigation occur. [Stauffer Depo. at p. 43:6-25 to 46:1 13.] That individual needed to provide a description of the event, which rules were allegedly violated, and a basis for why an investigation is warranted. BNSF has not produced that document. [Id.] James Pino denied any memory of who decided to investigate Voelker. [Jungbauer Decl. at Ex. D, Pino Depo. at p. 34:1-**

**9.] Dan Fransen could not recall everyone involved in making that decision. [Jungbauer Decl. at Ex. E, Fransen Depo. at p. 9:16-25 to 10:1-20.].**

72.     On April 5, 2017, after the investigation hearing, BNSF dismissed Plaintiff.  See Dismissal Letter at Ex. 31.

**Response: Undisputed.**

73.     BNSF has written discipline policies outlining the misconduct for which an employee may be dismissed (in addition to the login screen that explicitly warned that unauthorized dissemination of BNSF's business information could lead to discipline up to and including termination, see PEPA Policy at Ex. 32 and Deposition of Stephanie Detlesen (2/10/20). p. 31-32 at Ex. 33; BNSF followed the CBA regarding the investigation and discipline, see PLB Decision at Ex. 29; a disinterested manager conducted the investigation and it was reviewed by the PEPA team and approved senior management, Detlesen Depo. p. 10, 34, 35-38, 44, 49 - 53, 59 - 66, 186, 208 – 209 at Ex. 33 and Marx Depo p. 6-10; 16-17; 54; 56 - 57; 95 at  Ex. 28; the PLB upheld dismissal, see PLB Award at Ex. 29; and none of Volker's alleged protected activities are timely or connected to the discipline, Detlesen Depo. p. 10, 34, 35-38, 44, 49 - 53, 59 - 66, 186, 208 – 209 at Ex. 33 and Marx Depo p. 4-6, 12-16 at Ex 28.

**Response: Disputed. BNSF has no policies on LINQs or TSS. Employees are not trained, tested, audited, or provided guidance on using or accessing**

**confidential information. [Dkt. No. 130-11 Ex. 11 Hedgecock Depo. at p. 6:9-25 to 7:1-18; Wetsch Depo. at p. 3:22-25 to 4:1-7; Dkt. No. 130-2 Ex. 2 Voelker Depo. at p. 220:19-25 to 221:1-2, Voelker Decl. at ¶ 2; Dkt. No. 130-9 Ex. 9 Pino Depo. at p. 74-76.] BNSF's compliance with the CBA has no bearing on whether Voelker's rights were violated under the FELA or FRSA. Voelker's protected activities contributed to BNSF's adverse employment actions.**

**With respect to the company investigation required by the CBA, it was conducted by BNSF managers, on BNSF property, where BNSF was the judge, jury, and prosecutor. Importantly, the purported "disinterested manager" who conducted the investigation was in fact a BNSF employee instead of a neutral third-party. BNSF decided what evidence that Voelker could present. Voelker was not represented by counsel. The PEPA Team then reviewed that investigation before upholding Voelker's termination. The PLB review suffered from the same flaws because the PLB could only consider the transcript of the investigatory hearing.**

74.   BNSF assessed Voelker with a standalone dismissal in accordance with the progressive discipline in the Policy for Employee Performance Accountability ("PEPA"). See PEPA Policy at Ex. 32; Detlefsen depo. 49:7-13 at Ex. 33.

**Response: Disputed. BNSF's discipline of Voelker was excessive and not warranted under the circumstances. [Ogden Report]**

33

75.     Pursuant to Plaintiff's CBA, on June 30, 2017, Plaintiff's union, SMART, appealed Plaintiff's dismissal.  The grounds for the appeal were 1) alleged CBA procedural defects in notice of the investigation, 2) alleged refusal to postpone the investigation per the CBA, 3) alleged investigation evidentiary defects, including allow the decision to dismiss to be based upon Plaintiff's  November 2 letter to the Jungbauer firm, which enclosed copies of LINQ printouts,  4) the contention that LINQ information was not confidential, 5) that "Claimant is afforded protections under 45 USC 60," 6) that "[a]s an Employee Representative and Local Chairman, the Claimant is afforded great leeway and a level of immunity when it comes to representing his members," and 7) "retaliation for an asbestos litigation claim given the failure of the Carrier to issue a notice until after it had been contacted by the Claimant's legal representative."  Letter of J.M. LaPresta, dated June 30, 2017, Ex. 34; Voelker (11/20/19) Dep. at 93-95 at Ex. 2.

**Response: Disputed. The power of the PLB is limited and Plaintiff's attorneys have an objection to the use of the decision. BNSF's sudden inclusion of conduct that went beyond the initial notice, which only alleged "disclosure of confidential information" rather than the LINQs, was considered by the PLB. Although the shifting explanation may not be a violation of the CBA, it is circumstantial evidence that a trier of fact may use to prove an FRSA**

claimant's *prima facie* and substantive cases. *Defrancesco v. Union R.R. Co.*, No.
10-114, 2012 WL 694502 at *3 (A.R.B. Feb. 29, 2012) .

76.     In particular, Plaintiff's union's objection was that the November 2
letter and its LINQ printout enclosures should never have been considered in the
investigation hearing because they were not referenced in the investigation notice.
It further argued that if the LINQ printouts had not been considered, the October 28
emails, which only described information from the LINQ documents, would have
been protected under 45 USC 60.

**Response: Disputed. BNSF has offered no evidence to support this
statement. BNSF has offered shifting explanations for its termination decision,
which weighs in Voelker's favor.**

**77.**     Pursuant to Plaintiff's CBA, BNSF declined the appeal by letter dated
October 26, 2017 under the signature of Milton Siegele.   In that letter, it was
concluded that: "Further, Investigation Exhibit 9 also puts employees on notice that
improper dissemination of information obtained from TSS would also be grounds
for dismissal. The Claimant in this case provided plaintiffs attorney Jungbauer with
confidential information from the TSS application that plaintiffs attorney Jungbauer
did not have access too. The Claimant provided this confidential information with
the intent to aid plaintiff's attorney Jungbauer's lawsuit against the BNSF.
Furthermore, the Claimant intended to inflict damage to his employer for the last 38

years. The Claimant has irreparably broken the bond of trust between employer and employee." Voelker depo. Ex. 14.

**R**esponse: **Undisputed.**

78.     Pursuant to Plaintiff's CBA and the Railway Labor Act, Plaintiff and his union made a claim to Public Law Board No. 7832, asking for an "reinstatement to service with seniority rights unimpaired, removal of censure from his personal record and pay for all time lost including but not limited to the following: payment of vacation allowance, health and welfare costs, reimbursement for all expenses related to the pursuit of alternative employment, reimbursement for any damages incurred as a result of discharge from service." June 30, 2017 Appeal Letter at 1, Ex. 34.

**Response: Undisputed.**

79.     Plaintiff participated in and ratified the arguments made in this claim. Voelker (11/20/19) Dep. at 95-96, 178-179 at Ex. 2.

**Response: Undisputed.**

80.     In his submission, Plaintiff conceded that "[t]he Claimant subsequently sent a letter to Mr. Wooten's legal counsel that included the LINQ report dated November 5, 2015, for the BNSF 6867" but contended that it could not be considered in disciplining Plaintiff because of procedural technicality.   Organization Submission at 4, 12 at Ex. 36.

**Response: Disputed. BNSF citations do not support that statement of a procedural technicality.**

81.     Plaintiff and his union contended that he should be awarded relief because 1) he "was not afforded a fair and impartial investigation with his right to *due process* as guaranteed him by provisions of the controlling agreement," including "den[ying] [a] request for a reasonable postponement, 2) "the Claimant is afforded protections contained in 45 USC § 60," 3) that the October 28 emails did not contain any confidential information, 4) that "As an Employee Representative and Local Chairman, the Claimant is afforded great leeway and a level of immunity when it comes to representing his members" and "was fulfilling his role as Employee Representative when he did so ["release[d] the LINQ data"]" because "this information was incorporated in the on-property handling of Mr. Wooten's collectively bargained discipline proceedings," 5) "45 USC (The Railway Labor Act) prohibits the Carrier from interfering with the designation of a representative by an employee" and 6) the Claimant's concern that the investigation may have been in retaliation for an asbestos litigation claim given the failure of the Carrier to issue a notice until after it had been contacted by the Claimant's legal representative."[1] See Appeal letter at Ex.34.

**Response: Undisputed.**

---

[1] Plaintiff did not raise anything related to his asbestos litigation as a protected activity.  See OSHA Complaint at Ex. 37 and Amended complaint at Doc. 8.

82.     On January 16, 2019, the PLB rejected Plaintiff's arguments and denied his claim.  Public Law Board No. 7832 Award No. 60 Case No. 60 ("Award"), Voelker depo. Ex. 13 at Ex. 29, Voelker (11/20/19) Dep. at 90-91 at Ex. 2.

**Response: Disputed. The power of the PLB is limited and Plaintiff's attorneys have an objection to the use of the decision. However, even if the PLB felt the disciple was neither excessive nor unreasonable, it did not explicitly reject Plaintiff's arguments or deny his specific claims brought in this case.**

83.     The Board majority (the neutral and the carrier representative) concluded that "[t]he Claimant confirmed that, although he was an authorized user of the TSS application he was not authorized to disseminate information from TSS to Wooten's attorney."  Award at 2 at Ex. 29.

**Response: Disputed. The power of the PLB is limited and Plaintiff's attorneys have an objection to the use of the decision.**

84.     The Board majority concluded that "the Carrier properly considered the two emails sent out on October 28, 2015, as well as the subsequent letter dated November 5, 2015 during the investigation."  Award at 3 at Ex. 29.

**Response: Disputed. The power of the PLB is limited and Plaintiff's attorneys have an objection to the use of the decision. BNSF's sudden inclusion of conduct that went beyond the initial notice, which only alleged "disclosure of confidential information" rather than the LINQs, was considered by the PLB.**

Although the shifting explanation may not be a violation of the CBA, it is circumstantial evidence that a trier of fact may use to prove an FRSA claimant's *prima facie* and substantive cases. *Defrancesco v. Union R.R. Co.*, No. 10-114, 2012 WL 694502 at \*3 (A.R.B. Feb. 29, 2012) .

85.    The Board also concluded that "[b]y using self-help, the Claimant essentially denied the Carrier the opportunity to raise that issue [confidentiality] against production of the information in question."  *Id.*

Response: Disputed. The term "self-help" is one defined in the applicable CBA. It is not a term that is used in the FELA or the FRSA. Both the FELA and FRSA specifically authorize the disclosure of information to achieve their ends of promoting safe rail operations.

86.    The Board also concluded that section 45 U.S.C. 60 was not violated by investigating and disciplining Plaintiff.  Referring to the exception section 60, the Board quoted the case cited by Plaintiff's union: "However, the case goes on to say 'if, for example, an employee removes documents or confidential information from the railroad's offices, disciplinary action would be appropriate for violation of company rules.' That describes the facts of this case."  *Id.* at 4.

Response: Disputed. The PLB is comprised of three lay persons: one for the carrier (railroad), one for the organization (union), and a neutral third person. The PLB is tasked with determining whether the carrier's conduct

39

violated the applicable CBA. It is not, and should not, tasked with interpreting and applying federal law. No provision in the CBA authorizes the PLB to interpret or apply rights under the FELA, FRSA, or other federal statutes. As noted by the dissenting member of the PLB, that body was only charged with determining whether Voelker's conduct as the organization's representative was improper or if he could be internally disciplined for that conduct. Any findings outside the CBA were improper and exceeded the PLB's authority under the RLA.

87.     The Board also concluded that "the Claimant was not engaged in protected activity as Wooten's representative. He was an employee making an unauthorized disclosure of information for a pending civil action against the Carrier. Even if the Claimant actually believed that he was acting in a representative capacity, it would not excuse his resorting to self-help to improperly obtain documents for a private lawsuit." *Id.*   Moreover, the dismissal was "neither excessive nor unreasonable" even though this was "an unfortunate case given the Claimant's length of service." *Id.*

**Response: Disputed. The PLB is comprised of three lay persons: one for the carrier (railroad), one for the organization (union), and a neutral third person. The PLB is tasked with determining whether the carrier's conduct violated the applicable CBA. It is not, and should not, tasked with interpreting**

**and applying federal law. No provision in the CBA authorizes the PLB to interpret or apply rights under the FELA, FRSA, or other federal statutes. As noted by the dissenting member of the PLB, that body was only charged with determining whether Voelker's conduct as the organization's representative was improper or if he could be internally disciplined for that conduct. Any findings outside the CBA were improper and exceeded the PLB's authority under the RLA.**

88.    On June 8, 2017, Plaintiff filed a complaint with OSHA.  See complaint at Ex 37.  The OSHA complaint was dismissed on March 28, 2018.  See letter from U.S. Department of Labor at Ex. 38.

**Response: Disputed. In lieu of making substantive findings of fact, OSHA abdicated that responsibility and provided a short, perfunctory paragraph:**

*Investigative Findings:*
The Complainant has requested that OSHA terminate its investigation and issue a determination. Based on the information gathered thus far in its investigation, OSHA is unable to conclude that there is reasonable cause to believe that a violation of the statute occurred. Therefore, OSHA hereby dismisses the complaint.

**As noted above, OSHA made no note of what facts or information it had gathered or why those facts and information rendered it unable to reach a conclusion regarding whether a violation of the statute occurred.[Dkt No. 130-38 Ex. 38]**

89.    Plaintiff filed his objects to the Secretary's findings on or about April 25, 2018.  See Objections to OSHA Findings at Ex. 39.

**Response: Undisputed.**

90.    The parties conducted discovery on the OSHA claim and Plaintiff responded to discovery while the case was pending before the ALJ.  See discovery responses at Ex. 40.

**Response: Undisputed.**

91.    On August 15, 2018, the ALJ issued its Order Denying Discovery Requests.   See Order at Ex. 41.

**Response: Undisputed.**

92.    Plaintiff filed his Complaint in Federal Court, 9:18:CV-172-DLC, on September 27, 2018, asserting only his claims under the FRSA.  See Doc. 1.

**Response: Undisputed.**

93.    On October 8, 2018, Plaintiff submitted a copy of his federal court complaint to the Administrative Law Judge.  On October 5, 2018, the ALJ issued his Order Vacating Hearing and Order Dismissing Case, at Ex. 42.

**Response: Disputed. Plaintiff submitted a copy of his federal court complaint to the ALJ judge on October 2, 2018. [Dkt. No. 130-42 Ex. 42]**

94.    On December 12, 2018, Plaintiff filed his Amended Complaint.  Doc.

**Response: Undisputed.**

95.    Plaintiff served discovery responses in federal court after he filed his Amended Complaint.  His responses were the same as his responses to the same

42

requests when the FRSA claims were before the ALJ.  See discovery responses in federal court at Ex. 43.

**Response: Undisputed.**

96.    BNSF TY&E Safety Rule S-1.2.5 stated:  Safety Rules, Mandates, Instructions, Training Practices and Policies:  Comply with all appliable safety rules, mandates, instructions, training practices and policies.  BNSF Policies can be found on the BNSF Intranet.  Employees without Intranet access may request a copy of any applicable policy from a supervisor.

**Response: Disputed. BNSF did not cite this rule. Additionally, this rule was not used in Plaintiff's dismissal.**

97.    BNSF Policy on Confidential Information states: "Confidential Information:  Any nonpublic information about an individual or organization that, if disclosed, could adversely impact that individual or organization, such as exposing the individual or organization to criminal or civil liability or to damage to the individual or organization's financial standing, employability, private or reputation. Confidential Information may be in any form, including written, oral or electronic." See Ex. 11 to Investigation Transcript at Ex. 15.

**Response: Undisputed.**

98.    The BNSF Rule on Confidential Information states: "All persons with access to or possession of Confidential Information must take steps to protect

Confidential Information from risks that could compromise the security, confidentiality, and integrity of the information.   These steps must include the implementation of controls and procedures, appropriate physical and computer security, compliance with BNSF policies and the training of employees in the proper use of Confidential Information.   See Ex. 12 to Investigation Transcript at Ex. 15.

**Response: Undisputed**.

99.   Plaintiff was not prescribed any medication; did not seek mental health treatment, and found employment shortly after the discharge.   Voelker depo 11/20/19, p. 180:54-182:3 at Ex. 2. He engages in the normal activities of daily living. Voelker depo. 63:16-19, 78:17-79:25 at Ex. 2.

**Response: Disputed. Plaintiff suffered depression and anxiety after being dismissed after 38 years of loyal employment and then was fired over a safety item in the performance of his representation of a member. The need for medication or treatment for mental health is still possible in the future. Plaintiff did not find employment shortly after the discharge, it was 5 months later that he found a temporary 3-month job. He is continuously searching and applying for jobs while continuing to get rejected. BNSF cites no testimony that shows Plaintiff is engaging in normal activities of daily living. During closing arguments in Wooten, BNSF argued that Voelker "was more concerned about**

**manufacturing a defect to use in this court case" than safety. [Wooten Trial Tr. at p. 2936.]**

100.   BNSF has dismissed another employee who was similarly situated: Employee DP as comparator – Dismissal for violation of GCOR 1.6 and 1.15 and Policy for the Use of Internet/Intranet – failing to use the computer system for a valid business purpose and misuse of company time and computer resources.  See Letters of Dismissal and PLB Awards at Ex. 44.

**Response: Disputed. D.P. is not sufficiently similar to Voelker. D.P. disclosed reports from BNSF's systems "relating to the work history of two fellow employees…" Those employees then approached D.P. regarding why he had disclosed their information to his counsel without their consent. Voelker never disclosed any information regarding any other BNSF employee. Voelker merely relayed information regarding a locomotive's defects.**

101.   Employee JW – dismissal for violation of 1.6 for divulging confidential medical information pertaining to another employees.  See Letter of Dismissal at Ex. 45.

**Response: Disputed. J.W. is not sufficiently similar to Voelker. Voelker was terminated for disclosing information related to a locomotive defect, not information that BNSF's policies explicitly treat as confidential. Importantly, BNSF policy explicitly addresses confidential medical information. Specifically,**

**BNSF's Rule on Confidential Information prohibits the sharing of "Portable Health Information" or PHI, which includes confidential medical data. [Dkt. No. 134-2.] BNSF's policies and rules make no effort to distinguish LINQs and information in TSS that address locomotive defects.**

102.   Employees DB, JF and GM – dismissal for violation of GCOR 1.15, 1.3.3 and 1.16 – willful dishonesty and falsification of FRA tie-up documents, absence without authority, sharing and using confidential information and failure to comply with General Notice.  See letters of Dismissal and PLB Awards.

**Response: Disputed. These employees were not similarly situated. Each of these employees were terminated for dishonestly reporting their time. The only similarity between their conduct and Voelker's is that a computer was involved in the rule violation. BNSF does not contend that Voelker was dishonest, nor that he inaccurately reported his time on duty. Additionally, the language provided by BNSF is only in relation to employee GM.**

102. BNSF's Equal Opportunity, Anti-Discrimination and Harassment Policy ("EEO") states in part:

> Retaliation against an individual for exercising rights protected by this Policy, including the right to make a complaint and the right to participate or assist in an investigation of a complaint of discrimination, harassment or retaliation is prohibited.

> Discrimination, harassment and retaliation are considered misconduct. Any supervisor or manager who has knowledge of such conduct, and takes no action, is also subject to disciplinary action up to and including termination of

employment. Failure to comply with this Policy could result in disciplinary action, including termination of employment. The discipline assessed is determined by the facts and circumstances of each situation. This Policy does not limit BNSF Railway's authority to address workplace conduct that BNSF Railway determines to be unprofessional or otherwise unacceptable, regardless of whether that conduct meets the legal definition of discrimination, harassment or retaliation.

*See* Exhibit "47."

**Response: Undisputed.**

103. BNSF's Code of Conduct states:

Retaliation and discriminatory conduct are unacceptable and will not be tolerated. Any employee who believes he or she has been subject to discrimination, harassment or retaliation, or who witnesses or becomes aware of a possible violation of the Equal Employment Opportunity, Anti-Discrimination and Harassment Policy, must immediately report it to his or her supervisor, the appropriate Human Resources Representative or the BNSF Hotline at 1-800-533 BNSF. Reports to the BNSF Hotline may be submitted anonymously.

*See* Exhibit "48."

**Response: Undisputed.**

104. BNSF has a Hotline available to its employees to report behavior that is a violation of the company's Code of Conduct and policies. Such violations include harassment, discrimination and retaliation. *Id.*

**Response: Disputed. Not stated in the Code of Conducts, restatement of item 103.**

105. Between January 1, 2015 and July 31, 2017, a total of 1,275 SIRPS were filed by employees on the Montana Division. Seven employees completed formal

SIRP forms that mentioned "fatigue." None of these employees received discipline following these reports in that timeframe. See Declaration of Jill R. Lundvall, ¶¶ 3-4 (Nov. 15, 2019), attached hereto as Ex. 49.

**Response: Disputed. Lundvall's declaration should not be considered as evidence. Lundvall is not a witness in this case, nor a person with discoverable information.**

106. On the Montana Division between January 1, 2015 and July 31, 2017, twenty employees filled out ten or more SIRP forms. Of those, twelve employees had 25 or more SIRPS, and five of those employees filled out over 50 SIRPS (72, 67, 109, 65, 110). Of these employees, only three had subsequent Level-S discipline. This discipline was for failure to stop train before passing a signal, failure to apply blue signal protection, and failure to perform full time employment. *Id.,* ¶ 5.

**Response: Disputed. Lundvall's declaration should not be considered as evidence. Lundvall is not a witness in this case, nor a person with discoverable information.**

107. During that same time period, fourteen (14) employees reported seventeen (17) SIRPs related to crew lineups/calling/relief. Of those, only three employees have subsequent Level S discipline for indifference of duty; failure to adhere to requirements prohibiting change in locomotive controls; failure to be alert and attentive; and failure to stop before passing signal. *Id., ¶* 6.

**Response: Disputed. Lundvall's declaration should not be considered as evidence. Lundvall is not a witness in this case, nor a person with discoverable information.**

108.   Plaintiff's FRSA and mismanagement damages and claims are the same. See Discovery at Ex. 40 and Amended Complaint at Doc. 8.

| Neg. Mismanagement | FRSA |
| --- | --- |
| a. An award of back pay with interest appropriately compounded; | An award of back pay with interest appropriately compounded; |
| b. An award of benefits lost, including but not limited to credit for months of service that Mr. Voelker would have earned with the Railroad Retirement Board absent BNSF's unlawful termination of his employment; | An award of benefits lost, including but not limited to credit for months of service that Mr. Voelker would have earned with the Railroad Retirement Board absent BNSF's unlawful termination of his employment; |
| c. An award for emotional distress, pain, suffering, and loss of enjoyment of life; | An award for emotional distress, pain, suffering, and loss of enjoyment of life; |
| d. An award for any retraining tuition, and/or relocation costs; | An award for any retraining tuition, and/or relocation costs; |
| e. An award for any and all other compensatory damages, including litigation costs and reasonable attorneys' fees; | An award for any and all other compensatory damages, including litigation costs and reasonable attorneys' fees; |
| f. An award for the negative tax consequences of compensatory damages; and | An award for the negative tax consequences of compensatory damages; |

| g. An award of any other costs, disbursements, and interest allowed by law and/or equity. | An award of any other costs, disbursements, and interest allowed by law and/or equity; and Restatement Post Notice of Employee Rights Train Employees/Officer on FRSA |
|---|---|
| Punitive Damages | Punitive Damages |

**Response: Undisputed.**

Pursuant to Local Rule 56(b)(1), Plaintiff Mark Voelker submits this statement of additional facts in opposition to BNSF's Motion for Summary Judgment:

1.      Plaintiff Voelker was one of BNSF conductor Zachary Wooten's union local Chairman representatives in BNSF's disciplinary investigation of Wooten in 2015.

2.      Wooten filed a personal injury report with BNSF alleging that he was injured on or about July 31, 2015, while working on BNSF locomotive 6867 do in whole or in part to a defective locomotive door latch/handle.

3.      Voelker in his representation of Wooten requested to inspect the locomotive door latch/handle on BNSF 6867 prior to BNSF's disciplinary investigation hearing; BNSF refused to allow Voelker or any representative of Wooten to inspect the BNSF 6867 door latch/handle prior to BNSF's disciplinary investigation hearing regarding Wooten.

4.     Voelker at the disciplinary hearing investigation of Wooten attempted to introduce evidence of defects to other locomotive door latches/handles on BNSF locomotives of same manufacture, design and series; such evidence was rejected by BNSF hearing officer Rick Stauffer who stated that if Voelker could obtain evidence of a defect on BNSF 6867 that such evidence would be admitted into the record.

5.     BNSF claimed in the disciplinary investigation of Wooten that there was no evidence of any defect on the BNSF 6867 before or after July 31, 2015, the date of Wooten's injury.

6.     After BNSF's disciplinary investigation hearing regarding Wooten BNSF fired Wooten claiming that Wooten was dishonest in violation of GCOR 1.6 in his report of injury to BNSF.

7.     Voelker continued to represent and assist with representation of Wooten after BNSF's initial decision to fire Wooten as a result of the BNSF disciplinary investigation and hearing.

8.     Voelker assisted in drafting the initial first notice of appeal of BNSF's firing of Wooten which he forwarded to BNSF local Chairman Brent Wetsch who completed, signed and sent such appeal to BNSF Montana division manager Dan Fransen on October 28, 2015.

9.      On October 28, 2015, Voelker heard over the radio that BNSF 6867 was arriving at Whitefish Montana. This was the first opportunity that Voelker had to inspect the BNSF 6867 front door since Wooten's injury of July 31, 2015.

10.     Voelker boarded the locomotive 6867 with the outbound train crew and inspected the front door of the 6867 with the train crew and they noted that the screws on the front door latch mechanism were loose. Voelker asked the outbound train crew to report the safety defect to Fort Worth mechanical by radio at the first opportunity once they departed Whitefish, Montana.

11.     Jamie Roth, the conductor on the outbound train crew reported the defect on the latch mechanism of the front door of the BNSF 6867 to Fort Worth mechanical via radio on October 27, 2015. After completing his trip from Whitefish to Spokane Hauser he emailed Voelker confirming that he had made the defect report to Fort Worth mechanical stating the location of radio report, date, time and radio channel:  Vista, MT, October 28, 2015, on BNSF radio channel 054.

12.     The BNSF Fort Worth mechanical employees who received radio defect safety reports from train crews such as the radio report of Jamie Roth regarding the defective latch mechanism are required to document such defect in the BNSF TSS/LINQ database.  Such documentation is expected to be made within 24 hours or sooner of the report of defect.

52

13.     Defects on BNSF locomotives such as the defect reported by Mr. Roth regarding the BNSF 6867 front door latch are also reported by BNSF in UMLER and Railinc databases to provide notice of locomotive defects reported, inspections of such defects and repairs of such defects to other railroads including railroads that compete with BNSF.

14.     Voelker as a BNSF conductor and union local Chairman was authorized to access the BNSF TSS-LINQ database.

15.     On October 28, 2015, after receiving Mr. Roth's email confirmation that he had reported the front door latch mechanism defect to Fort Worth mechanical by radio, Voelker accessed the BNSF TSS-LINQ database to confirm that BNSF had properly logged Roth's safety report of the defect on the BNSF 6867 in the LINQ data base.

16.     When Voelker reviewed the BNSF TSS-LINQ defect status of the 6867 locomotive he noticed that there was no notation or log of Mr. Roth's report of defect of the 6867 front door latch in the LINQ database as of October 28, 2015.

17.     Voelker further noticed in the BNSF LINQ database that prior to the BNSF 6867 arriving in Whitefish, MT. on October 27, 2015, that a notation to the LINQ database indicated that the BNSF claims department had requested that the front door of the BNSF 6867 be removed and inspected at Cutbank, MT at

approximately (10:00 am).  The LINQ data base contained no further information

as to whether or not the front door of the 6867 was inspected, repaired or removed

at Cutbank and had no information or log by Ft. Worth mechanical or any other

BNSF employee of Roth's radio report of defect to the front door latch of the 6867

and no indication of a need or request to inspect and repair such defect.

18.     Voelker became concerned about the LINQ information and data and

raised several questions in his mind: why would BNSF claims department request

that the front door of the BNSF 6867 be removed for inspection on October 27,

2015, three months after BNSF claimed no defects were found upon inspection of

the front door shortly after Wooten's injury?  If any inspection, repair or door

removal of the front door of the 6867 had occurred at Cutbank prior to the 6867

arriving in Whitefish why were front door latch screws loose several hours later at

Whitefish when Voelker and the outbound train crew inspected such door latch?

19.     Voelker had learned prior to October 27, 2015 that Wooten had

chosen attorney William Jungbauer to assist him in legal matters relating to his

injury and termination.  Wooten had requested that Voelker provide copies of all

information and documents that Voelker had relating to Wooten to Jungbauer as

his attorney.  Voelker intended to assist Wooten as needed in ongoing or

anticipated investigations and/or claims/lawsuits/appeals.

20.     BNSF admits that a BNSF union local chairman such as Voelker is authorized to access TSS-LINQ data and information and to provide such information in support of a union member in disciplinary investigations or appeals.

21.     Wooten's BNSF appeals of BNSF discipline were not exhausted or complete as of November 5, 2015.   Wooten after completing his assistance in drafting the first appeal of discipline ultimately submitted by Wetsch believed that he no longer needed his files on Wooten and decided that he could forward such information to Wooten's attorneys as directed by Wooten as Voelker had "washed his hands" of his need of the files as he had completed writing of the appeal letter. Voelker believed he would continue to assist Wooten as needed in anticipated claims, investigations, appeals or as otherwise requested or needed to support Wooten.

22.     Wooten's anticipated potential or actual claims, defenses, appeals and investigations, development of evidence or opinions in which Voelker could or planned to assist Wooten with his knowledge, experience, and personal observation under the FELA, FRSA or other laws against BNSF and/or BNSF's anticipated potential or actual defenses thereto were not exhausted as of November 5, 2015.

23.     Voelker emailed copies of the email from Roth documenting Roth's radio safety defect call to BNSF Ft. Worth mechanical and LINQ data regarding defects on the BNSF 6867 to Wooten's attorney as directed by Wooten and to Brent Wetsch and Ryan Hedgecock who were local chairman who also represented Wooten.

24.     Voelker did not know whether or not the defective loose screws on the door latch on the BNSF 6867 that he and the outbound crew observed at Whitefish, MT on October 27, 2015, was the same door that Wooten had been injured on 3 months earlier or a replacement door requested to be taken off the 6867 by the claims department earlier that day.

25.     Voelker checked the LINQ database again on November 5, 2015, to determine whether BNSF had logged the defect complaint made by Roth to BNSF Ft Worth mechanical by radio on October 27, 2015 regarding the defective front door latch on the 6867.  He observed that the LINQ database did not have any record of Roth's radio defect report, no LINQ notation of need for inspection or repair, and no inspection or repair of the defect.

26.     Voelker also noted that the LINQ data base had no follow up entries regarding the BNSF claims request to have the door of the 6867 removed and preserved.

27.    Voelker printed off copies of the Defect comments for BNSF 6867 from the LINQ data base and provided copies to Wooten's counsel.

28.    BNSF never provided a copy of the LINQ defect comments documents regarding the BNSF 6867 (hat Voelker provided to Wooten's counsel) to Wooten or his counsel despite discovery obligations in either the ALJ case and this FELA/FRSA litigation prior to Voelker disclosing such documents to BNSF in discovery.

29.    On December 12, 2016, at 3:21 pm Nancy Ahern, the BNSF senior claims representative sent an email to her boss, Barry Wunker, BNSF manager of claims and senior BNSF claims official working on the Wooten litigation in Montana stating:

> This afternoon Jill Lundvall sent me to emails obtained through discovery in the Wooten case. He indicates in the emails that the access to information through the BNSF TSS system pertaining to the locomotive that Wooten claims to have been injured on, and provided that information to Bill Jungbauer and his paralegal. Voelker must have access to a command the line in TSS where he could pull the locomotive history from the LINQ.

> (Jungbauer Decl. Ex. 4, at 1217-12; Ex. 5 Ahern depo.)

30.    Later that same day, December 12, 2016 at 4:10 PM Wunker responded to Ahearn's email as follows:

"Thanks. I talked to Jill as well. Assuming your pulling updated defect comment history etc.  I need to better understand what he was seen on the claims request around the door removal."

(Jungbauer Decl. Ex. 4, at 1217-12; Ex. 5 Ahern depo.)

31.     Ahern admits that her boss, Barry Wunker asked her to provide the updated defect comment history on the 6867 locomotive on December 12, 2016. She claims that if she did obtain the defect comments inquiry it would be in LDFS. After reviewing YJB – Wooten 761 she admits that the LINQ report is dated November 5 of 2015.  She also admits that the defect report from Mr. Roth to Fort Worth mechanical on October 27, 2016 is not on the November 5, 2015 LINQ report.

32.      After the November 5, 2015 LINQ report, BNSF did not produce any LINQ defect comment history reports between November 5, 2015 and December 12, 2016.

33.     BNSF records including a copy of the taped radio report of Roth to Fort Worth mechanical and a BNSF document completed thereafter prove that Roth did in fact make the radio defect report regarding the front door latch defect on the BNSF 6867 to Fort Worth mechanical on October 27, 2015.

34.     BNSF was required to log the defect complaint regarding the front door latch on BNSF 6867 made by Mr. Roth in the BNSF TSS LINQ database defect comments.

35.     After the November 5, 2015 LINQ report BNSF did not produce any LINQ defect comment history reports between November 5, 2015 and December 12, 2016 to OSHA, the BNSF disciplinary appeal record, in discovery in Wooten or Voelker's OSHA litigation or in Wooten or Voelker's federal court litigations.

36.     BNSF official and 30(b)(6) witnesses Al Fingar testified that Roth's Fort Worth mechanical defect report  was required to be logged in TSS LINQ defect comments as a "Level 8" defect requiring inspection and repair as soon as possible, usually within 24 hours.   Fingar further testified that the BNSF TSS LINQ records would have remained an open defect until both the inspection and repairs would have been completed and documented in the TSS LINQ records. (Jungbauer Decl. Ex. 1, Fingar depo. at p. 36-43.)

37.     Should there have been a safety defect or safety issue regarding an appurtenance or appliance on a locomotive, such as a locomotive door, reported to the Fort Worth Mechanical Department, it would be considered a level 8 defect and uploaded to UMLER. (Jungbauer Decl. Ex. 1, Fingar depo. at pp. 84-88.

38.     Fingar testified "calling to report a safety issue, they [employees] need to - are expected to call and report the safety issue. The reporting to Fort

Worth mechanical department is a safety complaint. (Jungbauer Decl. Ex. 1, Fingar depo. at p. 121).

39.     BNSF undertook a detailed look at what information Voelker's employee identification number had accessed in TSS and its other systems during the period it considered him a "mole". [BNSF/Voelker 1217-7.] The railroad was looking to see whether Voelker was improperly using LINQ and "pulling al (sic) kinds of data that goes outside the scope of his role…" [*Id*.] Voelker testified:

> I also believe and believed then, and even long before the Wooten incident or even for the last 38 years, that no safety item or report of a safety item should be confidential. Everyone should know about it. It doesn't matter who. I mean, it's anybody that could use that locomotive…

(Dkt. 130-3, Ex. 2, Voelker depo. at p. 231.)

40.     Wunker participated and assisted BNSF in directing the evidence preservation officer Larry Fernandes to gather as much evidence on Voelker's access to TSS LINQ data information on occasions other than as a local Chairman:  In an email to Fernandes, Wunker stated:

> "Yes. If not too huge of a task let's get everything we can up to present.  It might still build a case he is pulling all kinds of data that goes outside the scope as his role as union griever.

(Jungbauer Decl. Ex. 4 at 1217-7.)

41.     Stephanie Detlefsen was a member of the PEPA team reporting to Derek Cargill at the time she reviewed Voelker's case in which she supported the decision for his dismissal. (Dkt. 130-10, Ex. 9, Detlefsen depo. at p. 10.)

42.     Detlefsen may have discussed Voelker's case Cargill and/or Maglisceau but did not recall specifics.  (Dkt. 130-10, Ex. 9, Detlefsen depo. at p. 11.)

43.     As part of Detlefsen's job duties she consulted with BNSF officers in the field on level of discipline for rule violations, it was more her expertise. (Dkt. 130-10, Ex. 9, Detlefsen depo. at p. 11-12.)

44.     Detlefsen testified all BNSF employees, including herself, Pino, Gabriel, Fransen Randle, and are expected to comply with all BNSF policies. (Dkt. 130-10, Ex. 9, Detlefsen depo. at p. 12.)

45.     Detlefsen does not know who the chief compliance officer for corporate rules is.  (Dkt. 130-10, Ex. 9, Detlefsen depo. at p. 27.)

46.     The rules department has the authority to interpret the GCOR rules. Dkt. 130-10, Ex. 9, Detlefsen depo. at p. 28.)

47.     The safety department has the authority to interpret employee safety rules. (Dkt. 130-10, Ex. 9, Detlefsen depo.at p. 28.)

48.     Detlefsen does know who the head of the Rules Department is.  (Dkt. 130-10, Ex. 9, Detlefsen depo. at p. 28.)

49.     Detlefsen does know who the head of the Safety Rules Department is. (Dkt. 130-10, Ex. 9, Detlefsen depo. at p. 28.)

50.     Pino is the Superintendent of Operations for BNSF, not in the Rules Department. (Dkt. 130-10, Ex. 9, Detlefsen depo. at p. 5.)

51.     Detlefsen has not searched for rules or interpretation of the GCOR rules in the rules department. (Dkt. 130-10, Ex. 9, Detlefsen depo. at p. 29.)

52.     In her role of the PEPA team reviews, she reads the investigation transcript and exhibits, she does not interpret rules.  (Dkt. 130-10, Ex. 9, Detlefsen depo. at p. 35.)

53.     Detlefsen claims she does not take the company's side in making decision, when she reads the transcript and exhibits, she is a neutral reader.  The rule was either violation or it wasn't.  (Dkt. 130-10, Ex. 9, Detlefsen depo. at p. 35.)

54.     The PEPA Policy is intended to address rule and that every member of the BNSF community has an equal policy violations in a consistent and fair manner so opportunity to achieve his or her full potential. (Dkt. 130-10, Ex. 9, Detlefsen depo. at p. 44.)

55.     Even previous PEPA Policy stated an "employee's supervisor may choose to handle the incident according to the general guidelines. If there is any doubt as to how an incident should be handled, supervisors are instructed to err on

the side of leniency." That BNSF supervisors can, if approved by a general manager, to grant leniency for serious violations. (Dkt. 130-10, Ex. 9, Detlefsen depo. at p. 46.)

56.    Detlefsen did not contact the Rules Department nor the sponsor of the confidentiality policy on whether the TSS system or documentation within the TSS system is confidential. (Dkt. 130-10, Ex. 9, Detlefsen depo. at p. 51.)

57.    Detlefsen testified she consulted only with the law department. (Dkt. 130-10, Ex. 9, Detlefsen depo. at p. 52.)

58.    To determine if the facts and exhibits constituted a violation of the corporate policy on confidential documents, Detlefsen contacted the law department, and spoke with Andrea Hyatt. (Dkt. 130-10, Ex. 9, Detlefsen depo. at p. 55.)

59.    Andrea Hyatt is a not a policy sponsor. (Dkt. 130-10, Ex. 9, Detlefsen depo. at p. 56.)

60.    One would contact the policy sponsor, Judy Carter, vice president compliance and audit, regarding BNSF's Corporate Policy on Confidential Information. (Dkt. 130-10, Ex. 9, Detlefsen depo. at p. 56.)

61.    Detlefsen does not recall contacting Judy Carter, only consulting with the law department. (Dkt. 130-10, Ex. 9, Detlefsen depo. at p. 56.)

62.     She did not feel it was necessary to involve anybody outside of the law department as she already involved the law department.  (Dkt. 130-10, Ex. 9, Detlefsen depo. at p. 153.)

63.     The TSS login states an individual "may be subject to discipline." (Dkt. 130-10, Ex. 9, Detlefsen depo. at p. 60.)

64.     Detlefsen has never asked why the term "may" is not defined in PEPA regarding the application of termination.  (Dkt. 130-10, Ex. 9, Detlefsen depo. at 149.)

65.     BNSF employees, as part of their role as local chairmen in representing their employees, can access BNSF system, such as the TSS system, as part of their job in representing their employees. (Dkt. 130-10, Ex. 9, Detlefsen depo. at p. 64.)

66.     She has had no training whether her job or job objectives would create a conflict of interest between her and employees such as Plaintiff.   (Dkt. 130-10, Ex. 9, Detlefsen depo. at p. 68.)

67.     Detlefsen testified in her PMP reflects "I am giving a deposition in another case on 12/1 and will work hard to earn another defense verdict."  She is involved in FRSA whistleblower 20109 cases: including Wooten, Jones, Vasquez, and Voelker.

**68.**     Detlefsen claims she involves the law department if an employee is alleging retaliation or if there's injury involved and, in this case, there was a lot of discussion about a lawsuit.   (Dkt. 130-10, Ex. 9, Detlefsen depo. at p. 87; Jungbauer Decl. Ex. 3, depo. Ex. 44 – filed under seal.)

69.     Detlefsen sends emails to and receives emails from Mr. Balanon. (Dkt. 130-10, Ex. 9, Detlefsen depo. at p. 87.)  She involves Balanon on any case that involves retaliation, 20109, or similar.  She does not recall what his role was in 2017.

70.     Detlefsen testified sometimes there are mitigating factors, and an employee might be offered leniency. (Dkt. 130-10, Ex. 9, Detlefsen depo. at 136.)

71.     She does not recall checking whether other employees were ever charged in disclosing confidential information in any way.  (Dkt. 130-10, Ex. 9, Detlefsen depo. at 138.)

72.     Does not know if she was copied on a December 14, 2016 from Wunker involving scheduling a conference call regarding Voelker.  (Dkt. 130-10, Ex. 9, Detlefsen depo. at 182; Jungbauer Decl. Ex. 6; BNSF/Voelker 1020-2.)

73.     Does not know the subject matter regarding the email string between March 27-29, 2017 in which she is a receipt of.  (Dkt. 130-10, Ex. 9, Detlefsen depo. at 182; Jungbauer Decl. Ex. 7; BNSF/Voelker 1020.34-38.)

74.     Detlefsen's PEPA recommendation email "I have read the record and have consulted with the law department. I support a stand-alone dismissal for Mr. Voelker on the basis of a malicious rule violation and willful disregard affecting the interest of the company. Please let me know if further discussion is needed. Stephanie Detlefsen." (Dkt. 130-10, Ex. 9, Detlefsen depo. at 186; Jungbauer Decl. Ex. 8, BNSF/Voelker 1020.314.)

75.     Does not recall communications with Gabriel regarding Voelker's dismissal.  (Dkt. 130-10, Ex. 9, Detlefsen depo. at 195; Jungbauer Decl. Ex. 9, BNSF/Voelker 1020.89.)

76.     Detlefsen wrote the synopsis "At the investigation, Mr. Voelker said he was merely fulfilling his duty to represent Mr. Wooten under the Railway Labor Act. He insisted he was well within his rights to divulge the information to Mr. Wooten's attorney." (Dkt. 130-10, Ex. 9, Detlefsen depo. at 196; Jungbauer Decl. Ex. 10, Detlefsen depo. Ex. 52.)

77.     Her synopsis further included "Mr. Voelker maintained throughout the hearing he was representing Mr. Wooten in his capacity as a local chairman and Mr. Jungbauer was not a third party but instead Mr. Wooten's proxy." (Dkt. 130-10, Ex. 9, Detlefsen depo. at 196; Jungbauer Decl. Ex. 10, Detlefsen depo. Ex. 52.)

78.     Voelker, as a local chairman, he was strictly working as a representative for Wooten's dismissal case and while the case was pending

66

arbitration, is obligated to continue building the record. (Dkt. 130-10, Ex. 9, Detlefsen depo. at 197).

79.     Detlefsen's PEPA Board synopsis acknowledged "Mr. Voelker said he was being singled out and retaliated against because Mr. Jungbauer represented him in an FELA claim against being singled out and retaliated against because Mr. Jungbauer represented him in an FELA claim against the company for asbestosis. (Dkt. 130-10, Ex. 9, Detlefsen depo. at 202-203; Jungbauer Decl. Ex. 10, Detlefsen depo. Ex. 52.)

80.     Detlefsen admitted that "malicious" is not a term found in *any* BNSF policies. [Dkt. 130-10, Ex. 9, Detlefsen depo. at p. 212- 213.) As James

81.     Cargill too testified that determining a violation was "malicious" would require speculation as to Voelker's intentions. (Jungbauer Decl. Ex. 10, Cargill depo. at p. 76.)

82.     BNSF's internal guidelines set standards of proof for company investigations. Those investigations are set forth in a confidential attachment. (Jungbauer Decl. Ex. 13, BNSF 1216-4 - CONFIDENTIAL, ATTORNEY'S EYES ONLY.)

83.     James Obermiller testified as a 30(b)(6) witness that no witness in this case was trained, tested, or audited for compliance on any of the rules at issue in this case. (Jungbauer Decl. Ex. 14, Obermiller depo. at pp. 44, 48, 52, 55.)

84.     Rick Stauffer testified, someone at BNSF, like Pino, needed to request an investigation occur. (Jungbauer Decl. Ex. 15, Stauffer depo. at p. 43-46).  That individual needed to provide a description of the event, which rules were allegedly violated, and a basis for why an investigation is warranted. BNSF has not produced that document. [*Id*.]  James Pino denied any memory of who decided to investigate Voelker. (Dkt. 130-10, Ex. 9, Pino depo. at p. 34.)   Dan Fransen could not recall everyone involved in making that decision.  (Dkt. 130-6, Ex. 5 Fransen depo. at p. 9-10.)

85.     Ryan Hedgecock is currently employed with BNSF.  Fears reprisal based on BNSF's interpretation of rules and selective enforcement. (Jungbauer Decl. Ex. 16, Hedgecock depo. at pp. 12-13.)

86.     BNSF claims manager Barry Wunker testified that the BNSF TSS LINQ defect comments report and reports by made Roth, and any required inspections or repairs made and logged in TSS LINQ between October 27, 2015 and December 12, 2016 TSS LINQ locomotive 6867 defect comments data could have been changed or altered by BNSF when the door of the 6867 was removed in December 2016.  (Jungbauer Decl. Ex. 2, Wunker depo. at p. 233-234.)

87.     Wunker and Ahern were involved from day one in discussions, emails, investigations and decisions between and among BNSF lawyers, Labor Relations officials and operating department officials regarding whether or not

Voelker should be disciplined for providing LINQ data to Wooten's representatives.

88.    The railroad discussed it is needed "to serve notice of investigation to the three other BNSF employees copied on Mr. Voelker's email to the plaintiff attorney for misconduct (GCOR 1.6) and failure to report a violation (GCOR 1.4. (Jungbauer Decl. Ex. BNSF/Voelker 1020-7.)

89.    BNSF officers discussed Voelker's FELA asbestos claims while preparing to notice the disciplinary investigation against him.  While making decisions whether to notice the investigation of Voelker and prior to terminating him, BNSF did not provide copies of those emails regarding BNSF decision maker knowledge until November 24, 2020.  BNSF did not disclose to OSHA the emails regarding BNSF discussions of Voelker's FELA asbestos claims.  BNSF did not disclose in its own disciplinary investigation record its knowledge of Voelker's asbestos claims.  BNSF did not disclose in the ALJ litigation its emails regarding Voelker's FELA asbestos claims.  BNSF did not disclose in Plaintiff's FRSA litigation its knowledge of Voelker's asbestos claims, until November 24, 2020. BNSF knew that Plaintiff believed that the filing of his FELA asbestos claim caused or contributed to BNSF's decision to hold the disciplinary investigation; however, Plaintiff did not have knowledge until November 24, 2020.

90.     BNSF Director of Locomotive and Air Brake Systems of Beau Price testified in the Wooten trial that he had reviewed BNSF records regarding the BNSF 6867.  He was asked at trial by BNSF counsel  Q:  Did you see any evidence of a defect with the locomotive door or door handle form the materials that you reviewed?  A: I saw none.  And I saw none – I could say that because there was no reporting that took place leading up to it.  There was no reporting after it.  We have the report from Mr. Wooten.  That was evaluated.  It was evaluated by our claims department.  He testified that he knew Roth reported the locomotive door latch problem and he admits that once someone calls in a defect on a door to the mechanical department that someone in the mechanical department should inspect the door at the first opportunity.  He says he never saw any report of any inspection.  An inspection of a defect he expected should have been logged and admits it was not logged. (Jungbauer Decl. Ex. 20, Wooten trial transcript excerpt.)

91.     BNSF had knowledge Voelker claimed there was a defect, that Voelker had knowledge BNSF was hiding defect information to BNSF 6867 prior to and after Wooten's investigation, BNSF claimed that there were no defects to the locomotive door on the BNSF 6867 before or after Wooten's injury.

92.     BNSF produced outlines for the officer conducting its investigation, Marx, and its witnesses, Pino and Hills. (Jungbauer Decl. at Ex. 21.)

92.    Andrea Hyatt, was surprised that Pino offered himself as a witness. Hyatt implied that Pino's testimony would represent a conflict of interest when she remarked that Pino would "make a great witness" but that his testimony would be improper because he would "be in the chain of command that decided discipline after the formal investigation hearing." (Jungbauer Decl. at Ex. 22.)

93.    BNSF's Conductor Officer Training sets forth various standards of proof at BNSF investigations. It has been submitted confidentially with the Court. (Jungbauer Decl. at Ex. 23.)

94.    Pino learned Voelker's disclosure of information on the LINQ before Voelker's investigation was noticed. Pino was one of the first at BNSF learn of Voelker's disclosure of the defects on Locomotive 6867. (Jungbauer Decl. at Jungbauer Decl. at Ex. 24). BNSF 1020-250.


DATED this 12nd day of January, 2021.

**Yaeger & Jungbauer, Barristers, PLC**


By: /s/ William G. Jungbauer
Attorney for Mark Voelker

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, a representative of the law firm of Yaeger & Jungbauer, Barristers, hereby certify that I served a true and complete copy of the foregoing  on the following persons by the following means:

|        |                            |
|--------|----------------------------|
| _____ | CM/ECF                     |
| _____ | Hand Delivery              |
| _2, 3_ | Mail                       |
| _____ | Overnight Delivery Service |
| _____ | Fax                        |
| 2,3    | E-Mail                     |

1.    Clerk, U.S. District Court

2.    Michelle T. Friend
      Joseph L. Breitenbach
      HEDGER FRIEND, P.L.L.C.
      2800 Central Avenue, Suite C
      Billings, Montana 59102
      (406) 896-4100
      (406) 896-4199 – facsimile
      mfriend@hedgerlaw.com
      jbreitenbach@hedgerlaw.com

3.    James E. Roberts
      KNIGHT NICASTRO MCCAY, LLC
      283 W. Front Street
      Missoula, Montana 59802
      (406) 493-7287
      (303) 845-9299 – facsimile
      roberts@knightnicastro.com


DATE:  <u>1/12/2021</u>                   <u>/s/ Roxanne Russell</u>